[Cite as *State v. Rydarowicz*, 2023-Ohio-916.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

FRANCIS RYDAROWICZ,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 21 MA 0087**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 19 CR 704

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Gina DeGenova,* Mahoning County Prosecutor*, Atty. Edward A. Czopur,* Assistant Mahoning County Prosecutor*,* Mahoning County Prosecutor's Office, 21 West Boardman Street, 6th Floor, Youngstown, Ohio 44503 for Plaintiff-Appellee and

*Atty. Louis M. DeFabio*, 4822 Market Street, Suite 220, Youngstown, Ohio 44512 for Defendant-Appellant.

Dated: March 16, 2023

**Robb, J.**

{¶1}   Defendant-Appellant Francis Rydarowicz appeals after being convicted of murder in the Mahoning County Common Pleas Court.  First, Appellant contends the testimony of the surgeon who operated on him on the day he stabbed his wife and the corresponding medical records were admitted in violation of the physician-patient privilege.  Next, Appellant claims the surgeon and a nurse should not have been permitted to testify about whether his wounds appeared self-inflicted or defensive because the state did not provide an expert report in discovery.  Appellant also argues the state did not present sufficient evidence on a lack of self-defense and claims the jury verdict was contrary to the manifest weight of the evidence.  For the following reasons, Appellant's conviction is affirmed.

## STATEMENT OF THE CASE

{¶2}   On June 22, 2019, Appellant stabbed his wife Katherine in the back while they were at a motel where he lived in Coitsville.  The police were called after the victim collapsed in the parking lot area.  After securing the victim's body, the police saw Appellant in the doorway of his motel room.  He was bleeding from the neck and wrist.  Before being transported to the hospital, Appellant claimed he stabbed his wife in self-defense.  Appellant was indicted for five alternate counts:  aggravated murder (prior calculation and design); murder (death caused purposely); murder (death proximately resulted from felonious assault); felonious assault (with a deadly weapon); and domestic violence (a third-degree felony due to prior convictions, with three priors listed).  (8/22/19 Ind.)

{¶3}   The case was tried to a jury in August 2021.  The victim's daughter testified her mother and Appellant were married and lived in the motel together.  She said Appellant was known by the name Jerry; she provided the names of his two sisters and his ex-wife (who were mentioned in recovered phone messages).  (Tr. 326-328).

{¶4}   Before the stabbing, a neighbor who lived near the motel saw Appellant and the victim talking near a tree where their dogs were tied.  She then watched the victim make two trips from the motel room carrying different baskets.  Minutes later, the neighbor

saw the victim running across the grass in front of the motel; she thereafter noticed the police at the scene. (Tr. 355-357).

**{¶5}** The victim's friend testified he provided the victim with a ride to do errands on the day of her death (as her vehicle was not running). (Tr. 333). While they were out, Appellant called the victim, prompting a trip to the motel so the victim could retrieve some belongings. (Tr. 334). The victim drove her friend's truck to the motel parking lot after dropping him off at the convenience store across the street from the motel to wait for her. (Tr. 336). The friend saw the victim bring a basket of items to his truck. He texted her a few times after worrying because she took longer than expected; she did not respond. (Tr. 338-339). When the friend exited the store, he saw a police officer approach a body in the drive of the motel's parking lot. (Tr. 339, 349).

**{¶6}** The first responding police officer testified he received a report at 6:30 p.m. that a woman had been shot at the motel. When he arrived, the victim had no pulse. He thus attempted chest compressions (but a large amount of blood was expelled from her nose and mouth). (Tr. 369-370). Bystanders pointed the police to a motel room. A second officer approached the room and found Appellant about to exit the room. This officer observed blood running from Appellant's neck to his chest and from his wrists; she instructed Appellant to step back into the room and lay on the bed. (Tr. 399-400). When asked about the location of the weapon, Appellant pointed to a knife on a table and said he had to use it to protect himself because the victim was coming after him. (Tr. 401-402, 420).

**{¶7}** Appellant was taken by ambulance to Mercy Health in Youngstown, where he underwent surgery on his neck and wrist. A nurse assisted with Appellant's post-surgical care. She heard Appellant tell his sisters the victim came looking for money and he had a car part under the bed but no money. (Tr. 500). Thereafter, the nurse supported Appellant's grieving mother as she entered his room. When the mother asked what happened, Appellant replied, "I stabbed her." (Tr. 490). He provided no further explanation to his mother. (Tr. 492). The nurse reported Appellant's statement to the hospital police. (Tr. 496). The nurse additionally testified Appellant's wrist wounds ran parallel on the inside of his left wrist. (Tr. 493-494). When she was asked if the wrist

wounds appeared to be defensive wounds, she said defensive wounds are generally not located on the inside of one's arms. (Tr. 495).

{¶8} Testimony was also presented by the trauma surgeon who operated on Appellant's neck and wrist after he arrived at the hospital. The surgeon described bilateral neck stab wounds, which measured 3 and 8 centimeters. (Tr. 731, 745). He also described three lacerations to Appellant's left wrist. One measured 3 centimeters and caused significant damage to arteries, tendons, and nerves; the other two wrist wounds were more superficial. (Tr. 732, 747). The surgeon believed Appellant's wounds were consistent with self-inflicted wounds and inconsistent with defensive wounds. (Tr. 734-735). He also said Appellant was right-handed and weighed 225 pounds. (Tr. 737, 739).

{¶9} In searching the motel room, the police did not find additional weapons. (Tr. 391). The referenced car part was not found in the room or in the truck the victim was loading. (Tr. 375-377, 434). Some blood in the parking lot matched Appellant's DNA. (Tr. 437, 716). The blood under the victim's fingernails and on various locations on her shirt only matched her own DNA. (Tr. 716-717).

{¶10} The sample of blood from the tip of the knife matched Appellant's DNA (with a statistic of one in one trillion). (Tr. 714). The sample of blood from the base of the knife blade contained a mixture of DNA from Appellant and the victim on one side of the blade and only Appellant's DNA on the other side of the blade. Only Appellant's DNA was recovered from the top and middle of the knife handle. (Tr. 714-715).

{¶11} The medical examiner testified the victim was stabbed in the left middle back. The wound was four to six inches deep and entered her lung. (Tr. 787, 790). She had three fresh bruises, located on her inside arm near her elbow, her right leg, and her right shin. (Tr. 784). Although there were cocaine metabolites in her blood, she had no active drug in her system and was thus not under the influence of cocaine at the time of her death. (Tr. 795, 798, 800). A painkiller in her system was at therapeutic levels. (Tr. 796-797, 800).

{¶12} A BCI forensic computer scientist extracted data from the phone Appellant possessed when he arrived at the hospital and from the victim's phone found in the truck she was loading. First, the witness recited texts between Appellant and one of his sisters. (Tr. 535-571); (St.Ex. 117a). On June 9, 2019, Appellant texted, "Hey I'm outta jail!! I am

ready to bash the shit outta her!!!!" In the next few days, Appellant asked this sister for money, requested his dad's phone number, and inquired why his mother would not speak to him. On June 13, he disclosed he needed items from the pharmacy, and the next day, he said he needed help. On the day before the June 22 stabbing, he told this sister, "It just keeps getting worse and there's no help. Mom still won't answer me. Have you talked to them? * * * I just don't know what to do."

{¶13} Appellant also communicated with his other sister, by text and instant message. (Tr. 572-594); (St.Ex. 115a, 116a). On June 9, 2019, he declared, "I'm outta jail let's get her" (with seven exclamation points). Two days later, he said, "I thought you knew what my plan was from [the other sister]." In seeming to speak about the victim, Appellant said he "had to kiss her ass for 2 months to save 3 years in prison [and] could not fight with her for any reason" and asked his sister if they could talk on the phone so he could explain. He added, "I just got home from jail and she's been gone. I fucking hate her!!!" He also disclosed the following issues: he was starving; his truck had a blown transmission; his bank account was frozen; he was "stuck" on house arrest; and he was not permitted to travel to renew his expired driver's license.

{¶14} On June 12, he told this sister he was up all night worried "about what you said. If something happens. I need to get someone on my bank account asap." He then spoke of his children, said the only person he trusted was his ex-wife (as opposed to the victim, who was his current wife), and asked his sister to help him communicate with them. Later messages indicate his ex-wife refused to communicate with him and was concerned with his expression of urgency. On June 14, he told his sister he was broke, going crazy, and trying to sell the dogs. On June 18, he observed, "I am homeless and she is gone!!!! I need my family. It's all I have to live for." On the day of the stabbing, Appellant told this sister, "my phone is going to be shut off any day now. They stopped my Social Security check. I'm jobless, and homeless. I have no reason to go on except for my kids and family. I need help immediately." An hour later, he said, "I can't keep texting like this. There is no time to waste. I need help immediately. If there's no chance. I need to know that."

{¶15} Conversations between Appellant and the victim were also admitted into evidence. (Tr. 595-643); (St.Ex. 114a). On June 7, 2019, Appellant expressed anger about the victim returning clothing to a man. Appellant told the victim he loved her and

then instructed, "get home, no more meaningless bullshit." Appellant also observed, "I can't believe I have to beg you to stay away from other men. You are torchering me to death!!!! I'm done talking about it. Just please come home. I love you." (Text spellings are original.) He then noted he did not want her to stay away because she thought he was mad. He texted he needed her to stop somewhere for him and later declared, "I'm throwing up. Please hurry." Minutes later, he said, "I was throwing up and I'm starving." The next day he said she was lying and pleaded with her to answer him. She eventually replied angrily with a screenshot of a social media post wherein he denigrated her in various aspects of life.

{¶16} On June 9, Appellant said, "Enjoy your knife and camo snot rag." He accused her of being unfaithful while he was away and said, "you went through 5,000 and partied your ass off. I hope you had fun. But I'm not taking your dumb unpredictable bullshit any longer. I can't. You'll end up putting me in prison. Your not worth it." The next text stated, "You had many chances to get away." Later, he texted, "Get your ass here right now!!!!! I have your things. I love you" (with 13 exclamation points). When he begged her to answer him, she replied, "Fuck you. Please never talk to me again." He responded, "You will be in my arms tonight safe and sound if it's the last thing I do!!"

{¶17} On June 14, the victim sent a captioned photograph of herself to Appellant. He deduced it was intended for someone else and replied, "Wrong man slut." After noting he viewed a post stating she was in a relationship, he said, "You're a whore and god knows it." The next day she asked for a car part he had, which she needed to fix her car. Among other insults, he said, "I wouldn't piss on you if you were on fire!!"

{¶18} On the day of the stabbing (after a week without communication), Appellant sent the victim a text asking if she still needed "this strut" and said he would put it on the car for her. When she asked the price, Appellant said, "I don't care. I just wanna do the right thing. I found some more clothes and you have mail here also." After they spoke on the phone, he told her to come alone, explaining he did not want to see her with another man. He also said she had some of his belongings, including a ring that "means more to me than it ever will you I want to be buried with that ring on my finger someday." In a subsequent text, Appellant observed, "You just called me. I heard a man's voice." (St.Ex. 114a).

{¶19} A stipulation was entered regarding Appellant's DNA profile and three prior domestic violence convictions. (Tr. 500). Appellant's parole officer testified he began supervising Appellant on June 5, 2019, based on a felony conviction of domestic violence where his wife was the victim. (Tr. 511). Upon questioning by defense counsel, the parole officer said he found no contraband or weapons at the motel when he visited Appellant. (Tr. 513). Appellant was on electronic monitoring house arrest (EMHA), and the records showed he did not leave his allowed area on the day of the stabbing (except when transported to the hospital). (Tr. 515, 855).

{¶20} Appellant testified in his own defense. He said the victim picked him up when he was released from incarceration on June 5, 2019, but she soon moved out of the motel; he said she returned three times to retrieve belongings with a police escort. (Tr. 865, 868, 870). He claimed the victim stole money from his wallet during one of the escorted visits. (Tr. 873). He confirmed sending the text messages to his sisters and acknowledged he was speaking about the victim in the initial texts but said "bash" merely referred to actions against a person on social media. (Tr. 872). He also acknowledged he was upset the victim was with other men. (Tr. 898, 903).

{¶21} Appellant revealed he had owned the subject knife since he was nine years old but claimed he did not have it at the motel before the victim arrived. (Tr. 874). He said the victim had his knife and his ring, about which they argued. (Tr. 881-882). He denied luring the victim to the motel by offering a car part and claimed the part was in his truck bed. (Tr. 873).

{¶22} Appellant alleged the following events occurred: after the victim made trips to a truck with her belongings, she followed him to the room and asked to look under the bed; he held up the box spring and mattress for her to look underneath the bed; he felt a sharp pain on the left side of his neck; he turned to see her coming at him with a knife; he raised his arm to protect himself and disarmed her; she turned to an open utensil drawer containing steak and paring knives; and he stabbed her in the back in self-defense because he saw his bleeding reflection in a mirror and feared for his life. (Tr. 884-887). He said he also sustained a smaller wound to the right side of his neck and wounds to his left wrists during the altercation. (Tr. 888-889). He denied his wounds were self-inflicted. Instead of calling an ambulance, he said he paced around the motel room trying to stop

his bleeding. (Tr. 936-937). Appellant confirmed he was right-handed and disclosed he was 6'2" (while the victim was 5'6" or less). (Tr. 914-915, 935).

**{¶23}** The jury found Appellant not guilty of aggravated murder but guilty of murder and the other alternate charges. The court sentenced Appellant to 15 years to life for the murder in count two, merging the remaining charges. (8/23/21 J.E.). The within appeal followed.

ASSIGNMENT OF ERROR ONE: PRIVILEGE

**{¶24}** Appellant sets forth three assignments of error, the first of which alleges:

"The trial court erred in permitting testimony concerning Appellant's medical treatment and his medical records as the admission of said evidence violated the patient-physician privilege."

**{¶25}** Appellant claims the trial court violated R.C. 2317.02(B)(1) by admitting the surgeon's testimony about Appellant's injuries from the day of the stabbing along with Appellant's resulting medical records. He claims the defense was highly prejudiced by the following parts of the surgeon's testimony: Appellant was right-hand dominant; the wounds did not appear defensive but appeared to be self-inflicted; and Appellant was referred for a psychiatric consult. This information was also expressed or implied in the medical records. When the state first called the surgeon to the stand, defense counsel objected in an unrecorded sidebar and continued to object throughout the surgeon's testimony; the court thereafter allowed counsel to specify his objections on the record at which time the physician-patient privilege was asserted. (Tr. 726, 752-753).

**{¶26}** According to statute: "The following persons shall not testify in certain respects: * * * A physician * * * concerning a communication made to the physician * * * by a patient in that relation or the advice of a physician * * * given to a patient * * *." R.C. 2317.02(B)(1) (with exceptions not alleged to be applicable here). Communication means "acquiring, recording, or transmitting any information, in any manner, concerning any facts, opinions, or statements necessary to enable a physician, advanced practice registered nurse, or dentist to diagnose, treat, prescribe, or act for a patient." R.C. 2317.02(B)(5)(a). The term includes any medical or hospital communication "such as a record, chart, letter, memorandum, laboratory test and results, x-ray, photograph, financial statement, diagnosis, or prognosis." *Id.*

**{¶27}** However, the physician-patient privilege in R.C. 2317.02(B) "is in derogation of the common law and must be strictly construed." *In re Miller*, 63 Ohio St.3d 99, 109, 585 N.E.2d 396 (1992). The privilege is not a requirement of due process or otherwise constitutionally based; the purpose of the privilege is not about the fairness of trial. *State v. Webb*, 70 Ohio St.3d 325, 334-335, 638 N.E.2d 1023 (1994). Other relevant statutes may evince higher priorities involving justice.

**{¶28}** A criminal statute provides: "no person giving aid to a sick or injured person shall negligently fail to report to law enforcement authorities any gunshot or stab wound treated or observed by the person, or any serious physical harm to persons that the person knows or has reasonable cause to believe resulted from an offense of violence." R.C. 2921.22(B). The failure to report is a misdemeanor of the second degree. R.C. 2921.22 (I). "No disclosure of information pursuant to this section gives rise to any liability or recrimination for a breach of privilege or confidence." R.C. 2921.22(H). Although certain other regulated disclosures are not required if there was a physician-patient privilege, the duty to report in division (B) is not included in this physician-patient privilege exemption. *See* R.C. 2921.22(G)(1) ("Divisions (A) and (D) of this section do not require disclosure of information, when * * * The information is privileged by reason of the relationship between * * * physician and patient").

**{¶29}** The state points to a Supreme Court case where a defendant convicted of assaulting his wife challenged the trial court's admission of a physician's testimony on the wife's injuries. *State v. Antill*, 176 Ohio St. 61, 197 N.E.2d 548 (1964) (where the wife did not waive the physician-patient privilege). The physician described the wife's injuries and provided an opinion on their cause; when asked whether the puncture wound to the chest "could have happened by a person just walking, say, into a sharp instrument," he suggested it could not, opining the person would "recoil as quickly as possible." *Id.* at 62, 66.

**{¶30}** The Supreme Court said the purpose of the privilege in R.C. 2317.02 was "to encourage patients to make a full disclosure of their condition and symptoms to their physicians without fear that such matters will later become public. [However,] Against the interest of the patient in having his condition remain confidential, must be balanced the

Case No. 21 MA 0087

interest of the public in detecting crimes in order to protect society." *Id.* at 64-65.[1] "To accomplish this end," the predecessor statute to R.C. 2921.22(B) was enacted. *Id.* at 65, citing former R.C. 2917.44 (which initially covered a gunshot wound or a wound inflicted by a deadly weapon). Accordingly, it is:

> proper for the physician who treats [a wound covered by the reporting statute] to testify in court as to the nature of the wound. The publicity against which the privilege is supposed to protect has already taken place. The details of the wound must have been reported by the physician to a law-enforcement officer. The only purpose that sustaining the privilege can now serve is to obstruct the course of justice.

*Antill*, 176 Ohio St. at 65.

{¶31} In a subsequent Supreme Court case, the victim was beaten to death in a hotel room; her jaw was broken and multiple teeth were knocked out. A hotel employee told police another employee suffered a hand injury on the day of the murder. After the suspected employee filed a worker's compensation claim for his hand injury, the police subpoenaed the related medical records and questioned Appellant's hand surgeon. *State v. Jones*, 90 Ohio St.3d 403, 404, 739 N.E.2d 300 (2000). At trial, this surgeon opined the injury appeared to be a fist-to-mouth wound and revealed he discovered an organism typically found in dental plaque within a culture from the defendant's infected hand wound. *Id.* at 406.

{¶32} On appeal, the defendant argued his attorney was ineffective by failing to raise the physician-patient privilege in R.C. 2317.02(B). The Supreme Court rejected this argument because "the privilege was inapplicable in the circumstances of this case * * * even if counsel had objected to [the surgeon's] testimony, the trial court would have been required to overrule the objection and allow [the surgeon] to testify." *Id.* at 408.

{¶33} The Court relied on the statutory requirement for a physician to report "any serious physical harm to persons that the physician * * * knows or has reasonable cause to believe resulted from an offense of violence." *Id.*, quoting R.C. 2921.22(B). The requirement to report "is absolute, i.e., no privilege attaches in the cases covered." *Id.* at

---

[1] The policies in favor of disclosure may be even stronger after the legislature transferred the burden to the state to disprove self-defense.

409 (citing a comment to the original enactment). As to any failure to actually report, it was noted the surgeon's suspicion of a fist-to-mouth injury was substantiated when the police informed him the defendant was a murder suspect and the surgeon would have been required to report the injury if he learned the defendant was a suspect from a source other than police. *Id.* at 408. It was therefore concluded R.C. 2921.22(B) was applicable "even though [the surgeon] did not report the injury." *Id.*

{¶34} The *Jones* Court further observed there was no reason to distinguish the portion of the statutory division at issue in that case from the deadly weapon portion at issue in *Antill*, finding the underlying policies were identical. *Id.* at 409 (reiterating if the details of the wound should already have been reported, then the only purpose in applying the privilege at trial would be to obstruct justice). The Court thus confirmed a physician in such a scenario can be asked to describe the wounded person and the nature and location of the wounds. *Id.*

{¶35} Here, as to the neck wounds, the surgeon observed and treated stab wounds to Appellant's neck. He was required to report the wounds under the plain language of R.C. 2921.22(B). The surgeon's knowledge of the existing homicide investigation and any resulting failure to initiate a report did not defeat his ability to testify in response to a subpoena. *See Jones*, 90 Ohio St.3d at 408 ("As it was, he was already in contact with the police, so the reporting was no longer required. The situation is no different than if [the surgeon] had reported appellant's injury on his own initiative.").

{¶36} We also note the grammatical set up of the statutory provision makes clear the gunshot and stab wound portions of the division are not modified by the "knows or has reasonable cause to believe resulted from an offense of violence" portion of the statute, which modifies only the "any serious physical harm to persons" portion. *See* R.C. 2921.22(B). As the Supreme Court observed, "R.C. 2921.22(B) requires that physicians and certain others giving aid to an injured person report to law enforcement personnel gunshot or stab wounds *and further requires* reporting 'any serious physical harm to persons that the physician * * * knows or has reasonable cause to believe resulted from an offense of violence.'" (Emphasis added.) *Jones*, 90 Ohio St.3d at 408.

{¶37} As for any suggestion that some wounds were not actually "stab wounds" under R.C. 2921.22(B), the physician can speak to other presenting injuries on the body

of the patient when testifying about stab wounds, especially major lacerations potentially caused by the same weapon as the stab wound. In *Antill*, the wife suffered a stab wound to the chest, other cuts, and "bruises about her arm and upper body." The physician "testified relative to the condition in which he found Mrs. Antill and gave his opinion as to the cause of her injuries." *Antill*, 176 Ohio St. at 62. There would be reasonable cause to believe Appellant's wrist wounds resulted from the same offense of violence. Moreover, a laceration can begin as a stab wound. In fact, the medical records described Appellant's wrist injuries as not only "Laceration of left wrist" but also involving "Stab Wound of left wrist" and said the Appellant presented on June 22, 2019 with "multiple stab wounds" to both the neck and the left wrist. (St.Ex. 120 at 4, 15, 19, 31, 36-37, 45, 55, 59, 66, 70).

{¶38} Furthermore, the avoiding-publicity purpose of the physician-patient privilege was already eliminated as to the existence, location, and general appearance of the wounds, and "the interest of the patient in having his condition remain confidential" was outweighed by "the interest of the public in detecting crimes in order to protect society." *See Antill*, 176 Ohio St. at 65. Appellant was transported to the hospital after the police ordered him an ambulance; his neck and wrist wounds were already observed by the officers at the scene of the crime. Before Appellant was rushed to the hospital to receive blood transfusions and surgery on his bleeding neck and wrist, he informed police he had to stab his wife because she came after him. By claiming self-defense, he essentially conceded there was "reasonable cause to believe" his wounds "resulted from an offense of violence" R.C. 2921.22(B). The pre-surgical medical records mentioned the patient was assaulted and stabbed with a knife in the neck and wrist, and a post-surgical note says the patient reported his injuries occurred during a knife fight. (St.Ex. 120 at 7, 24). The state's theory about Appellant causing his own injuries (to create a self-defense story or to kill himself after committing a murder) would not prohibit the surgeon from testifying about Appellant's wounds.

{¶39} Appellant attempts to create an exception or distinguish *Jones* by pointing out the physician in that case was informed of a crime during police questioning after treatment of the patient, whereas law enforcement here was involved before Appellant arrived at the hospital and there was no indication they questioned the surgeon. However,

this argument is not convincing. *Jones* rejected an argument that R.C. 2921.22 did not result in a "waiver of the physician-patient privilege" for trial just because the duty to report previously arose. *See Jones*, 90 Ohio St.3d at 408. Moreover, the Court applied *Antill* and generally concluded R.C. 2921.22(B) was applicable "even though [the surgeon] did not report the injury." *Id.* (where the surgeon answered questions to police before trial). In *Antill*, the Supreme Court indicated if "[t]he details of the wound *must have been* reported by the physician to a law-enforcement officer[, then the] only purpose that sustaining the privilege can now serve is to obstruct the course of justice." (Emphasis added.) *Antill*, 176 Ohio St. at 65 (with no mentioning of an actual report to police or questioning by police). The basis for the lifting of the statutory privilege is the fact that a different statute requires a report on certain injuries, not that police questioned a physician.

**{¶40}** The surgeon who operated on Appellant's wounds was informed about Appellant's status as a suspect by police, and he *was questioned*, at trial, about injuries required to be reported under R.C. 2921.22. Because the surgeon was "required [by statute] to report" the injuries, he "may testify, without violating the physician-patient privilege, as to the description of the wounded person, as to his name and address, if known, and as to the description of the nature and location of such wound, obtained by examination, observation and treatment of the victim." *Jones*, 90 Ohio St.3d at 408-409, quoting *Antill*, 176 Ohio St. 61 at paragraph four of the syllabus. Accordingly, there was no error in allowing the surgeon to testify about Appellant's condition and the location and nature of his wounds, including whether the surgeon believed a wound appeared defensive or a wound appeared self-inflicted.

**{¶41}** The additional disclosure about referring Appellant for a psychiatric consult showed the surgeon took steps typical for self-inflicted wounds, reinforcing his testimony on the nature of the wounds. Considering the surgeon was permitted to testify about the nature of the wrist wounds appearing self-inflicted, this additional information was not surprising and was not prejudicial (even assuming arguendo it was beyond the scope of the permitted disclosures). Plus, after stating such referral was typical for self-inflicted wounds, the surgeon noted it was sometimes issued for victims of assault as well.

**{¶42}** In fact, the state argues the medical evidence contested as privileged and prejudicial was harmless even assuming arguendo some of it was inadmissible. Even when an improper evidentiary admission is somewhat prejudicial, the error can be declared harmless beyond a reasonable doubt if the court excises the offending evidence and finds the remaining evidence of guilt is overwhelming. *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 27-28, 31-33 ("blatant prejudice may override even a strong case and require a new trial. As noted, however, an improper evidentiary admission * * * may be deemed harmless error on review when, after the tainted evidence is removed, the remaining evidence is overwhelming"). *See also State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, 123 N.E.3d 955, ¶ 177; *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37 (to find an error was not harmless, the court must find defendant was prejudiced by the error, the error was not harmless beyond a reasonable doubt, and the evidence remaining after excising the prejudicial evidence fails to establish the defendant's guilt beyond a reasonable doubt).

**{¶43}** The state points to the overwhelming evidence presented against Appellant (as discussed in the Statement of the Case supra and in the third assignment of error infra), including: his messages to the victim and his sisters; the location of his DNA on the tip of the knife in comparison to the victim's DNA on the bottom of the knife blade; his ownership of the knife; the victim being stabbed in the back; and his admission to stabbing her *after* he (allegedly) took the knife from her. We also note the nurse had already testified: Appellant was treated in the trauma unit for critical care patients after undergoing surgery for neck and wrist injuries; he had parallel wrist wounds on the inside of his left wrist; and defensive wounds to this area were generally seen on the outside of the forearm.

**{¶44}** In any event, the surgeon was permitted to testify as to Appellant's condition during treatment and the location and nature of the wounds. This assignment of error is overruled.

ASSIGNMENT OF ERROR TWO: EXPERT REPORT

**{¶45}** Appellant's second assignment of error provides:

"The trial court erred by permitting the State to introduce expert testimony when the State and the experts failed to produce a written expert's report within 21 days of trial as required by Crim.R. 16(K)."

**{¶46}** The surgeon who operated on Appellant after he was delivered by ambulance to the emergency room and the nurse who attended to Appellant after the surgery testified as fact witnesses. Appellant argues the portion of their testimony on defensive wounds crossed into the territory of expert opinions, requiring the state to provide expert reports in discovery before trial. Because the defense was not provided expert reports with qualifications attached, Appellant argues the opinion testimony on defensive or self-inflicted wounds should have been excluded under Crim.R. 16(K).

**{¶47}** Specifically, after the nurse testified to hearing Appellant tell his mother he stabbed the victim and to observing Appellant's wrist wounds ran parallel on the inside of his left wrist, she said she was familiar with defensive wounds through her work as a trauma nurse where she learned from physicians and courses. (Tr. 494, 501). Over objection, the nurse then testified: "Defensive wounds generally are when someone's coming at you, you see them to the hands, you see them to the outside of the forearms. You may see them to the back part of the shoulders. Anywhere where you're trying to escape or – it's your body's natural defense to protect the core of your body." (Tr. 493-494). The prosecutor next asked the nurse if Appellant's wrist wounds were consistent with defensive wounds based on her training and experience as a trauma nurse. After the court overruled another objection, the nurse answered, "We generally don't see defensive wounds on the inside of arms." (Tr. 495).

**{¶48}** The surgeon later testified about Appellant's wounds. The prosecution asked if he was familiar with defensive wounds in his work as a trauma surgeon. (Tr. 733). Over objection, he said defensive wounds occur when someone who is being assaulted tries to fight off the assailant and Appellant's wrist wounds were not consistent with defensive wounds based on his training and experience as a trauma surgeon and were consistent with self-inflicted wounds. (Tr. 734-735). On cross-examination, defense counsel prompted the surgeon to clarify that a stab wound to the neck would not be classified as a defensive wound even if it was inflicted by another. (Tr. 741-742).

{¶49} Before proceeding, we point out the defense objection to the nurse's testimony on defensive wounds was not specified on the record under Evid.R. 103(A)(1) (timely objection to the decision to admit evidence must be made "stating the specific ground of objection, if the specific ground was not apparent from the context"). An objection during the nurse's testimony on the wounds was discussed at sidebar; however, the sidebar was off the record. (Tr. 493, 495). The surgeon testified after the nurse. The defense objections to the surgeon's testimony on defensive and self-inflicted wounds were not initially specified on the record, as an unrecorded sidebar was also held before the surgeon answered whether the wounds appeared defensive. At the conclusion of the surgeon's testimony, the court called a recess so defense counsel could place his objections in the record. In addition to arguing physician-privilege, defense counsel said the surgeon offered expert opinions on defensive wounds without a Crim.R. 16(K) report while acknowledging he received his client's medical records in discovery. (Tr. 750-753). There was no reference to the nurse's prior testimony during this recitation of the objections.

{¶50} Pursuant to Crim.R. 16(K), "An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications." The purpose of this rule is to strengthen the due process right to a fair trial and to prevent unfair surprise by giving notice to the defendant so he has an opportunity to challenge the expert's findings or qualifications. *State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44, ¶ 44, 48 (expert report of coroner should have disclosed he would testify on time of death and on his comparison of a wound to an item collected by the state as evidence).

{¶51} Although courts typically have discretion in admitting evidence, "the plain language of Crim.R. 16(K) limits the trial court's discretion and provides its own specific remedy for a violation of the rule." *Id.* at ¶ 54 (but confers discretion to modify the 21-day requirement "for good cause shown, which does not prejudice any other party"). "Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial." Crim.R. 16(K). The rule only requires exclusion of the violative portion of the

testimony. *See Boaston*, 160 Ohio St.3d 46 (and does not preclude a harmless error analysis).

**{¶52}** While Appellant relies on *Boaston* and the exclusionary language in Crim.R 16(K), the state urges the nurse and surgeon were fact witnesses testifying about wounds they observed under Evid.R. 701. It is argued the statement that a wound did not appear defensive or appeared self-inflicted is still part of the description of the wound and could be mentioned from these fact witnesses, just as it could be mentioned by a police officer or other fact witness.

**{¶53}** Evid.R. 702 provides three requirements before a person can testify as an expert: (A) the testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (B) the witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; and (C) the testimony is based on reliable scientific, technical, or other specialized information. However, a fact witness can provide opinions, and a fact witness is not necessarily testifying as an expert merely because he has expertise in a certain field.

**{¶54}** "It is well established that a treating medical professional may be called at trial to testify as an observer of a patients' physical condition and not as expert retained in anticipation of litigation." *State v. Reed*, 5th Dist. Delaware No. 20 CAA 04 0021, 2021-Ohio-858, ¶ 30. "Evid.R. 701, testimony by a lay witness, allows treating physicians to render opinions based upon their personal observations and perceptions." *Id.*

**{¶55}** "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Evid.R. 701. *See also* Evid.R. 704 ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact."). The opinion of a layperson uses a reasoning process familiar in everyday life, as opposed to the opinion of an expert using a reasoning process that is mastered by a specialist in the field. *State v. Baker*, 2020-Ohio-7023, 166 N.E.3d 601, ¶ 34 (7th Dist.), citing *State v. Johnson*, 7th Dist. Jefferson No. 13 JE 5, 2014-Ohio-1226, ¶ 56. We review

a decision to admit evidence under Evid.R. 701 under an abuse of discretion standard of review, whereby a decision will not be reversed unless it is unreasonable, arbitrary, or unconscionable. *City of Urbana ex rel. Newlin v. Downing*, 43 Ohio St.3d 109, 113, 539 N.E.2d 140 (1989) (pointing out that even where the admission of lay opinion testimony was not required, this does not mean the admission of such testimony was an abuse of discretion).

{¶56} Where a police officer provides an opinion, we have explained how this may qualify as a lay witness opinion rather than an expert opinion, even though it is based on a particular officer's knowledge and experience. *Baker*, 2020-Ohio-7023 at ¶ 34 (detective's knowledge of cell phone tower and GPS technology), citing *Johnson*, 2014-Ohio-1226 at ¶ 57, 62 (officer's opinion on whether defendant's tattoos were gang-related). "The Ohio Supreme Court has accepted the trend toward allowing lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702." *Id.* at ¶ 35, citing *State v. McKee*, 91 Ohio St.3d 292, 296, 744 N.E.2d 737 (2001).[2] The Court concluded a lay opinion based on personal knowledge and experience can fall within Evid.R. 701 *even on a subject outside the realm of common knowledge*. *McKee*, 91 Ohio St.3d at 296-297 (a drug user can testify on the identity of drugs if the proper foundation is laid).

{¶57} The Eighth District found a psychologist testified as a fact witness when she discussed the child's disclosure and her perception and treatment of the child but seemingly expressed expert opinions when explaining the hallmarks of childhood sexual abuse. *State v. Heineman*, 2016-Ohio-3058, 65 N.E.3d 287, ¶ 20-22 (8th Dist.). The court found the issue was harmless if an expert report was required, noting the medical records lessened any prejudice. *Id.* at ¶ 22-23. The court concluded the trial court did not abuse its discretion in admitting the testimony and cited the emerging precedent allowing a witness with firsthand knowledge to offer *lay opinion testimony* if "they have a reasonable basis—grounded either in experience or specialized knowledge—for arriving at the opinion expressed." *Id.* at ¶ 25-26, quoting *McKee*, 91 Ohio St.3d at 296.

---

[2] *See also State v. Boczar,* 113 Ohio St.3d 148, 2007-Ohio-1251, 863 N.E.2d 155, ¶ 28 (officer's testimony on horizontal gaze nystagmus test is not expert opinion); *State v. Schmitt*, 101 Ohio St.3d 79, 2004-Ohio-37, 801 N.E.2d 446, ¶ 15 ("officer's observations regarding a defendant's performance on nonscientific field sobriety tests [is] admissible as lay evidence of intoxication").

**{¶58}** The Ninth District held a treating physician from a children's hospital, who was testifying about the injuries she observed as a fact witness, was permitted to testify the injuries appeared non-accidental without having provided an expert report to the defense where the physician's conclusion was consistent with the medical records. *State v. Heller*, 9th Dist. Lorain No. 18CA011304, 2019-Ohio-4722, ¶ 8. The court concluded the treating physician "testified as a lay witness and provided an opinion based upon her personal observations of the baby, which would have been helpful to the jury's understanding of the testimony or the determination of a fact in issue" under Evid.R. 701. *Id.* at ¶ 10. *See also State v. Brofford*, 3d Dist. Union No. 14-12-08, 2013-Ohio-3781, ¶ 31-37, 40 (a treating physician testifying as a fact witness could opine the wounds were consistent with the history provided without having supplied an expert report). The Ninth District additionally said the defendant could not claim prejudice from the lack of an expert report, even if the treating physician's conclusion ventured into the realm of expert opinion, because the defense was not taken by surprise and the ability to cross-examine the witness was not obstructed. *Heller*, 9th Dist. No. 18CA011304 at ¶ 10*.

**{¶59}** Here, the physician at issue was Appellant's own surgeon who operated on his wounds on the day the victim was stabbed. The surgeon gained knowledge about defensive wounds and self-inflicted wounds in his experience and training, as did the nurse. They did not claim to be experts in the field of stabbing reconstruction. As the state points out, the witnesses did not testify the wounds were inconsistent with defensive wounds to a reasonable degree of medical certainty. Just because a fact witness could qualify as an expert on certain medical topics does not mean every opinion they give on a wound becomes an expert opinion. More specifically, merely because a witness is a trauma surgeon or trauma nurse (and has expert knowledge in their particular field) does not mean such a witness provides an expert opinion when asked if the wrist wounds they observed were in a location consistent with defensive wounds.

**{¶60}** A police officer could have testified whether an arm wound was in a location consistent with a defensive wound based upon the officer's experience and training. *See, e.g., State v. Jones,* 2015-Ohio-4116, 43 N.E.3d 833, ¶ 108 (2d Dist.), citing *State v. Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, ¶ 77 (allowing a police officer to testify about his personal observation of the victim displaying defensive marks, which

he recognized from his experience and training). The evaluation of wound location for consistency with a defensive or self-inflicted wound does not involve "a process of reasoning that only specialists in the field can master." *See McKee*, 91 Ohio St.3d 292 at fn. 2. In fact, it is common knowledge that wounds from a suicide attempt with a knife are commonly made on the inside of the wrist. Moreover, the instinct to defend yourself when a knife is coming toward your neck is a matter of common knowledge a juror could consider along with the mechanics of their own arms raised in mock defense.

**{¶61}** A fact witness who answers questions about wrist wounds (on exactly where, how many, or how long) assists the fact-finder in their decision-making. The surgeon and nurse were fact witnesses whose testimony provided "opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue" as permitted by Evid.R. 701. The addition of testimony on whether the location of an arm wound was consistent with a self-inflicted wound did not clearly stray over the line into expert territory in this case.

**{¶62}** Even if the characterization of the wounds crossed the boundary between fact and expert opinion, the defendant's medical records were provided in discovery. The medical records showed the defendant was consistently classified as a suicide attempt by those treating him at the hospital immediately after the injuries were sustained. *See Reed*, 5th Dist. No. 20 CAA 04 0021 at ¶ 32 (even if the physician testified as an expert, the medical records pertaining to the victim's emergency room visit were provided to the defense); *Heller*, 9th Dist. No. 18CA011304 at ¶ 10 (even if the physician presented some expert testimony, there was no prejudice where the victim's medical records were provided). We discussed the medical records in more detail in the prior assignment of error. The defense knew of the self-inflicted classification in the disclosed medical records. In opening statements, defense counsel advised the jury they would hear about the wounds and would conclude Appellant did not inflict them on himself. The defense was prepared to ask the surgeon about this wound characterization and clarified on cross-examination that a neck wound can be suffered by another's infliction in an offensive manner (even if not considered a defensive wound). The testimony on defensive or self-

inflicted wounds by disclosed treating witnesses, consistent with disclosed medical records, was not an ambush situation.

{¶63} This leads to the state's alternative argument that any error would be harmless because there was overwhelming evidence showing guilt beyond a reasonable doubt when the record is considered without the testimony on the wounds appearing to be self-inflicted wounds. *See Boaston*, 160 Ohio St.3d 46 at ¶ 61-70 (applying harmless error after finding exclusion was mandatory where an expert report did not contain certain topics upon which the expert opined), citing *Harris*, 142 Ohio St.3d 211 at ¶ 37 (for harmless error test). Any exclusion under this assignment of error would be the specific characterization of a wound as being consistent with a defensive wound, a self-inflicted wound, or neither; the testimony would not be excluded in its entirety. *See Boaston*, 160 Ohio St.3d 46. The jury would still hear about the factual location and physical appearance of the wounds from the surgeon and the nurse.

{¶64} We refer to the state's alternative argument under the prior assignment of error for a discussion of harmless error and to the following recap of the other evidence and the reasonable inferences to be drawn therefrom: Appellant's messages to the victim and his sisters; his ownership of the knife; his admission to the police officer he stabbed the victim *after* he disarmed her; the victim being stabbed in the back; the lack of other weapons in the motel room; and his admission to his mother he stabbed the victim (without adding an allegation of self-defense); and the location of Appellant's DNA on the tip of the knife in comparison to the victim's DNA on the bottom of the knife blade (as evidence of the order of the knife's insertion).

{¶65} In any event, this assignment of error is overruled, as Appellant's treating medical personnel were testifying as fact witnesses and presented testimony consistent with disclosed medical records.

ASSIGNMENT OF ERROR THREE: SUFFICIENCY & WEIGHT

{¶66} Appellant's third assignment of error contains two separate topics, alleging:

"The jury's verdicts of Guilty were not supported by sufficient evidence and were against the manifest weight of the evidence."

{¶67} Whether the evidence is legally sufficient to sustain a conviction is a question of law dealing with adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678

N.E.2d 541 (1997).  An evaluation of witness credibility is not involved in a sufficiency review, as the question is whether the evidence is sufficient if taken as true.  *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79, 82; *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001).  In other words, sufficiency involves the state's burden of production rather than its burden of persuasion. *Thompkins*, 78 Ohio St.3d at 390 (Cook, J., concurring).

**{¶68}**  In reviewing the sufficiency of the evidence, the court views the evidence in the light most favorable to the prosecution to ascertain whether a rational juror could have found the elements of the offense proven beyond a reasonable doubt.  *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998).  *See also State v. Filiaggi*, 86 Ohio St.3d 230, 247, 714 N.E.2d 867 (1999) (reasonable inferences are also viewed in favor of the state); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (all of the evidence is to be considered in the light most favorable to the prosecution, including reasonable inferences).  The question is merely whether "any" rational trier of fact could have found the contested elements were adequately established.  *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998), quoting *Jackson*, 443 U.S. at 319.

**{¶69}**  Appellant admitted he stabbed his wife, and he does not contest the sufficiency of the evidence on the statutory elements of the offenses.  However, Appellant contends the state failed to present sufficient evidence to show he did not act in self-defense.

**{¶70}**  Self-defense is an affirmative defense with an atypical burden of proof due to the March 28, 2019 statutory amendments to R.C. 2901.05.  "The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense other than self-defense, defense of another, or defense of the accused's residence presented as described in division (B)(1) of this section, is upon the accused."  R.C. 2901.05(A).  "If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used

the force in self-defense * * * the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense * * *." R.C. 2901.05(B)(1). [3]

{¶71} Deadly force can be used in self-defense if the defendant: (1) was not at fault in creating the situation giving rise to the confrontation; (2) had a bona fide belief he was in imminent danger of great bodily harm and that the only means of escape from such danger being the use of such force; and (3) did not violate a duty to retreat or avoid the danger. *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002). Appellant acknowledges the state need only disprove one of the elements of self-defense. *See State v. Sarge*, 5th Dist. Knox No. 21CA000014, 2021-Ohio-4379, ¶ 30, citing *State v. Carney*, 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶ 31. Applying a sufficiency of the evidence test, Appellant concludes no rational fact-finder could have found an element of self-defense was disproven even when the evidence is viewed in the light most favorable to the state.

{¶72} However, as the Supreme Court recently explained, the statutory amendment to R.C. 2901.05 did not place a burden of production on the state to be reviewed for sufficiency. *State v. Messenger*, __ Ohio St.3d __, 2022-Ohio-4562, __ N.E.3d __. The amendment merely constituted a "change to the state's burden of persuasion regarding self-defense" because requiring the state to disprove an affirmative defense beyond a reasonable doubt does not cause the affirmative defense to become an element of the offense. *Id.* at ¶ 24. The defendant still has "the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense." *Id.* at ¶ 25 (the defendant satisfies his burden of production if the evidence and any reasonable inferences would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant). Accordingly, a self-defense claim that is submitted to the jury is not subject to review for the sufficiency of the state's evidence, as a sufficiency analysis applies only to the elements of an offense

---

[3] In addition, there is a presumption of self-defense if the defendant used "defensive force that is intended or likely to cause death or great bodily harm" against a person who "is in the process of unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered, the residence or vehicle occupied by the person using the defensive force." R.C. 2901.05(B)(2), (3) (inapplicable if the other person has a right to be in, or is a lawful resident of, the residence or vehicle or if the defendant used the force while unlawfully, and without privilege to be, in that residence or vehicle), (4) (rebuttable by preponderance of the evidence).

and the affirmative defense of self-defense remains subject only to a manifest weight of the evidence review on appeal. *Id.* at ¶ 27. We thus consider Appellant's contentions under his weight of the evidence argument.

**{¶73}** Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Thompkins*, 78 Ohio St.3d at 387. The court evaluates the effect of the evidence in inducing belief, but weight of the evidence is not a question of mathematics. *Id.* A weight of the evidence review considers whether the state met its burden of persuasion. *Id.* at 390 (Cook, J., concurring) (as opposed to the burden of production involved in a sufficiency review). When a defendant claims the conviction is contrary to the manifest weight of the evidence, the appellate court is to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, 78 Ohio St.3d at 387.

**{¶74}** "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact occupies the best position from which to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

**{¶75}** Where a case is tried by a jury, only a unanimous appellate panel can reverse on manifest weight of the evidence grounds. Ohio Constitution, Article IV, Section 3(B)(3). The power of the court of appeals to sit as the "thirteenth juror" is limited in order to preserve the jury's primary function of weighing the evidence. *Thompkins*, 78 Ohio St.3d at 389.

**{¶76}** As mentioned above, Appellant acknowledges a negative finding on one of the three self-defense elements would support the rejection of the defense. First, Appellant claims there was no evidence he was at fault in creating the situation because

the victim came to the motel, she previously came with police escorts, no one said he started an argument, and he testified she stabbed him from behind with a knife she previously stole from him. Second, he says being stabbed in the neck would give rise to his bona fide belief of imminent danger of great bodily harm and stabbing her in the back was his only means of escape because she was heading toward a utensil drawer after he wrested the knife from her hand. Third, he points out there is no duty to retreat from one's home. *State v. Williford*, 49 Ohio St.3d 247, 250, 551 N.E.2d 1279 (1990).

{¶77} However, Appellant's first two arguments rely on his version of events. The state presented persuasive evidence contradicting Appellant's story. To recap, Appellant sent concerning texts about the victim and about his life to his sisters. His texts showed he was having a hard time finding a reason for hope in life. He was upset his wife was seeing other men and no longer wished to be in a relationship. He previously mentioned a plan to "bash the shit out of her." He argued with the victim in texts in the weeks preceding her death while she refused to return to the motel. After a week of silence, he texted to say he would give her a car part she needed, encouraging her to come to the motel alone for the part and some of her belongings. The police did not recover a car part. The victim came to the motel that day and began retrieving her belongings from the room. After a few trips to the vehicle with baskets, the victim ran from the motel with a deep stab wound to the middle of her back.

{¶78} Appellant owned the switchblade knife that killed the victim (stating he received it as a ninth birthday present). The fact that a parole officer did not find "contraband or weapons" when he first visited the motel room did not mean the knife was brought to the motel thereafter. Appellant was 6'2" while the victim was 5'6" or less. Appellant did not call 911 to report the alleged attack or seek an ambulance for the victim or himself even though he said he was worried about the blood running from his deep wounds.

{¶79} Only the victim's own DNA was found in the blood recovered from her body and clothes. The location of Appellant's blood on the knife in comparison to the location of the victim's blood was telling as to the sequence of events. Appellant's DNA was recovered from the tip of the knife and the handle while the victim's DNA was only recovered from the bottom of the blade, suggesting she was stabbed first. Circumstantial

evidence and direct evidence inherently possess the same probative value. *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001).

**{¶80}** Appellant admitted he stabbed the victim to his mother in front of a nurse but did not contemporaneously mention his self-defense story to his mother, even though he previously told a police officer he used the knife to protect himself because the victim was coming after him. Appellant testified in his own defense. We note the jury did not believe the state's theory that Appellant killed his wife with prior calculation and design, as the jury found him not guilty of aggravated murder. However, they believed he purposely killed her without falling under a self-defense scenario. The jury saw Appellant's demeanor and gestures as he claimed the victim stabbed him in the left side of his neck and then caused cuts to the inside of his left wrist and a stab wound to the other side of his neck as he was disarming her. They heard his voice and watched for any signs of deceit as he said his wounds were not self-inflicted. The jury was not required to believe the victim attacked Appellant. It was reasonable for the jury to conclude Appellant's wounds were self-inflicted in a suicide attempt or in an attempt to create the appearance of a legal justification for stabbing his wife.

**{¶81}** The jury was in the best position to judge Appellant's credibility and weigh the evidence. When there is more than one believable interpretation of the evidence, we do not choose which theory we believe is more credible and substitute it for the theory chosen by the jury. *State v. Baker*, 7th Dist. Mahoning No. 19 MA 0080, 2020-Ohio-7023, ¶ 148, citing *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999). The jury did not clearly lose its way and create a manifest miscarriage of justice, and this is not the "exceptional case where the evidence weighs heavily" against the jury verdict and requires this court to step in as the "thirteenth juror." *See Lang*, 129 Ohio St.3d 512 at ¶ 220. This assignment of error is overruled.

**{¶82}** For the foregoing reasons, Appellant's conviction is affirmed.

Waite, J., concurs.

D'Apolito, P. J., concurs.

Case No. 21 MA 0087

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**