**[Cite as *State v. Ramirez*, 2025-Ohio-4977.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio

Court of Appeals No. {48}L-24-1228

    Appellee

Trial Court No. CR0202301937

v.

Antonio Ramirez

**DECISION AND JUDGMENT**

    Appellant

Decided: October 31, 2025

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and,
Randy L. Meyer, Assistant Prosecuting Attorney, for appellee.

Henry Schaefer, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Following a jury trial, defendant-appellant, Antonio Ramirez, appeals the August 2, 2024 judgment of the Lucas County Court of Common Pleas, convicting him of numerous counts of rape and gross sexual imposition. For the following reasons, we affirm the trial court judgment.

# I. Background

{¶ 2} Antonio Ramirez was convicted of the following offenses committed against his daughter, N.R., his niece, A.P., and his niece's friend, L.P.:

| Count | Offense | Statute | Degree | Victim | Date of Offense | Sentence |
|---|---|---|---|---|---|---|
| 1 | Gross sexual imposition | R.C. 2907.05(A)(4) and (C) | F-3 | N.R. | 10/1/17 to 2/28/19 | 60 months, consecutive to all other counts |
| 2 | Rape | R.C. 2907.02(A)(1)(b) and (B) | F-1 | N.R. | 10/1/17 to 8/31/19 | 25 years to life, consecutive to all other counts |
| 3 | Rape | R.C. 2907.02(A)(1)(b) and (B) | F-1 | N.R. | 10/1/17 to 8/31/19 | 25 years to life, consecutive to all other counts |
| 4 | Rape | R.C. 2907.02(A)(2) and (B) | F-1 | N.R. | 8/2/21 to 8/10/21 | 11 to 16.5 years, consecutive to all other counts |
| 5 | Gross sexual imposition | R.C. 2907.05(A)(1) and (C) | F-4 | N.R. | 8/2/21 to 8/10/21 | 18 months, consecutive to all other counts |
| 6 | Rape | R.C. 2907.02(A)(2) and (B) | F-1 | N.R. | 8/2/21 to 8/10/21 | 11 years, consecutive to all other counts |
| 7 | Gross sexual imposition | R.C. 2907.05(A)(1) and (C) | F-4 | N.R. | 8/2/21 to 8/10/21 | 18 months, consecutive to all other counts |
| 8 | Gross sexual imposition | R.C. 2907.05(A)(1) and (C) | F-4 | A.P. | 6/22/21 to 8/31/21, amended to 10/2/21 | 18 months, consecutive to all other counts |
| 9 | Gross sexual imposition | R.C. 2907.05(A)(1) and (C) | F-4 | L.P. | 6/1/21 to 8/31/21 | 18 months, consecutive to all other counts |
| 11 | Rape | R.C. 2907.02(A)(2) and (B) | F-1 | A.P. | 8/1/19 to 6/30/20 | 11 years, consecutive to all other counts |

2.

The court granted Ramirez's Crim.R. 29 motion for acquittal as to Count 10.

**A. N.R.**

{¶ 3} According to the evidence presented at trial, Am.R. and Ramirez were in a relationship from 2006 to 2018. They never married, but they lived together on Boxelder Road and had three children together: N.R., An.R., and J.R. Ramirez left their home in 2018, and moved in with his sister on Raymer Boulevard. Am.R. and Ramirez remained living apart, but for one week around August 2, 2021, Ramirez stayed with the three children while Am.R. was hospitalized with complications of her pregnancy with her fourth child, who was not Ramirez's child.

{¶ 4} On February 9, 2023, around 11:00 p.m., Ramirez and Am.R.'s oldest daughter, N.R., came to Am.R. and disclosed that Ramirez had molested her. Am.R. wanted to go to the police immediately, but N.R. wished to wait until morning. The next morning, Am.R. took N.R. to the police station to make a report.

{¶ 5} N.R. was 17 years old at the time of trial. She described several incidents where she had been molested by her father. The first time, she was in the fifth or sixth grade. She woke up to her father touching her breasts with his fingers in his mouth. He had lifted up her shirt and touched her bare nipple. The second incident occurred when she was in the sixth or seventh grade. She was asleep on the couch and awoke to her father placing his toe inside in her vagina more than one time. The third incident occurred when she was in the seventh or eighth grade. She was asleep next to her mother

3.

and awoke to her father placing his finger in her vagina. These incidents all occurred at their home on Boxelder.

{¶ 6} Two incidents occurred when Ramirez lived on Raymer. The first occurred one night when N.R. was watching a movie with her cousins in her cousin's bedroom. After she fell asleep, her father carried her downstairs, put his finger in her vagina, and used his mouth on her breasts. She was approximately 13 years old when this happened. The next time, N.R. had friends stay the night at her cousin's house. Ramirez told N.R.'s friends to move to the floor, and he got into bed with N.R. He began touching her, placing his finger in her vagina, and "dry-humping" her. She could feel his erect penis. N.R. was 13 years old when this incident occurred.

{¶ 7} The final incidents occurred in August of 2021, when Ramirez stayed with his children at the Boxelder house while Am.R. was in the hospital. N.R. was sleeping in her mother's bed. She awoke to Ramirez touching her aggressively. He removed her shorts and began "dry-humping" her, and he touched her vagina with his finger. He was interrupted when N.R.'s brother came in the room and turned on the light. N.R. testified that this was the first time Ramirez had ever removed her clothing, and she believed that he would have "raped" her that night if her brother had not interrupted him. Earlier that week, Ramirez had done the same thing, but less aggressively. He inserted his finger into her vagina and touched her breasts. N.R. testified that every time these incidents occurred, Ramirez pretended to be asleep. She explained that she didn't tell her mother about these incidents until February of 2023, because she was scared and embarrassed.

4.

**{¶ 8}** N.R.'s brother recalled the August 2021 incident. He testified that he did not see anything happen, but when he walked into his mother's room, his father jumped up from the bed and he had a gut feeling that something was wrong. He did not tell anyone about it until his sister disclosed that she had been molested.

**{¶ 9}** FBI Special Agent Sean Pieja testified that he interviewed Ramirez concerning N.R.'s allegations. Agent Pieja explained that FBI policy prohibits recording the first part of these types of interviews due to the use of sensitive techniques. He testified that he intended to record the second part of the interview—and, in fact, began recording it—but the battery on the recording device died 12 minutes into it. Agent Pieja also attempted to arrange for a backup recording through Oregon Police Detective Lawrence George, but technical issues prevented this from occurring. The brief portion of the interview that was successfully recorded was played for the jury. Agent Pieja testified to statements made by Ramirez that were not recorded.

**{¶ 10}** According to Agent Pieja, Ramirez admitted to engaging in sexual activity with N.R. on approximately six occasions. He claimed that N.R. initiated the sexual activity while Ramirez was in a semiconscious state due to heavy drug and alcohol use. Ramirez described that N.R. placed his hand on her breasts and vagina and rubbed herself with his hand and engaged him in "dry-humping." He claimed that she had also "dry-humped" his hand and foot. Ramirez told Agent Pieja that he was aware of the sexual activity and was a willing participant. He said he "wanted the sexual activity to happen."

5.

{¶ 11} Agent Pieja also testified that Ramirez described one incident where he had blood on his finger after having his hand in N.R.'s pants. Agent Pieja drew a picture of a hand on a post-it note and Ramirez indicated on the drawing how far he had inserted his finger into N.R.'s vagina—Ramirez said that he "barely placed a finger inside of her vagina." He also told Agent Pieja that his hand smelled like N.R.'s vagina.

{¶ 12} Detective George conducted a recorded interview of Ramirez, which was played at trial. During the interview, Ramirez acknowledged that he had engaged in sexual activity with N.R. six times while he lived with her on Boxelder. He claimed that each time, N.R. initiated it, but he didn't stop her. He conceded that there was an incident where he had blood on his hand, but he claimed that N.R. put his hands on her body and rubbed them on her. Ramirez said that this particular incident occurred around Christmastime, and this was the time that his son walked in and turned on the lights. Ramirez admitted that another incident occurred while Am.R. was in the hospital in August of 2021. He said that N.R. straddled him. He denied penetrating N.R.'s vagina, but described that they had "dry-humped."

{¶ 13} Ramirez testified in his own defense. He acknowledged six sexual encounters with N.R., all of which he said occurred at the Boxelder home, and all of which he claimed were initiated by N.R. Again, he denied ever penetrating N.R.'s vagina or placing his hand in her pants. He claimed that he woke up one day with blood on his finger, and he described that on one occasion, N.R. placed his hand in her pants and on her breasts. He denied ever telling Agent Pieja that his hand smelled like *N.R.'s* vagina—

6.

he said that he stated simply that his hand smelled like vagina. He also denied that the picture on the post-it note represented the depth of the insertion of his finger into N.R.'s vagina. He said that it was meant to represent where on his hand he saw the blood. Ramirez also accused N.R. of "humping" his hand and foot. He surmised that N.R. made these accusations because she did not like his girlfriend, who he began dating in August of 2022.

{¶ 14} The State presented rebuttal evidence showing that on July 23, 2022—*before* Ramirez began dating his girlfriend—N.R. described Ramirez's sexual abuse in an electronic journal entry. The journal entry was admitted into evidence.

## B. A.P.

{¶ 15} A.P. is Ramirez's niece and was 17 years old at the time of trial. She testified that on October 3, 2021, while Ramirez was living with her family on Raymer, her uncle touched her inappropriately. She described that he came into her bedroom and asked her to put on a movie, which was not unusual. The two of them fell asleep on opposite sides of the bed, but she awoke to Ramirez grabbing her waist and "dry-humping" her from behind. His erect penis was touching her backside, but they were both clothed. At first she was frozen by fear and confusion, but she turned toward him, causing him to stop. She pushed him away from her and told him to move, but he pretended to be asleep and did not respond. Eventually, she got up and left the room.

{¶ 16} The next day, A.P. told her father that her uncle made her uncomfortable, but she did not tell him the full details due to fear and embarrassment. They decided that

7.

she should talk to her mother about it, which she did later that day. A.P., her mother, her grandmother, and her aunt, confronted Ramirez and told him to leave the house.

{¶ 17} On cross-examination, A.P. conceded that she initially told detectives that she was unsure of the exact date of the incident and believed it may have occurred in the summer. She explained that she was eventually able to recall—based on a TikTok she had saved—that the incident occurred on October 3, 2021.

{¶ 18} Ramirez denied engaging in sexual activity with A.P. both during police interrogations and at trial.

### C. L.P.

{¶ 19} L.P. is A.P.'s friend. L.P. testified that in the summer of 2021, when she was 14 years old, she was staying with A.P. because of a fire at her home. She was asleep in A.P.'s bed and awoke to Ramirez cuddled against her. He had his hand on her vagina, outside her clothing, and he was "dry-humping" her from behind. She could feel his erect penis. He abruptly stopped without her having to say or do anything. She did not immediately tell anyone, but once she learned that Ramirez had inappropriately touched A.P., she disclosed that the same thing had happened to her.

{¶ 20} Agent Pieja testified that Ramirez admitted engaging in "dry-humping" with L.P.—but said that she initiated it—and he was "fully aware" that it was happening and "he willingly participated in it." During the videotaped interview with Detective George, Ramirez again admitted that he and L.P. "dry-humped" on July 4, 2021, and he

8.

again claimed that L.P. initiated the activity. He said that she tried to engage him in sexual activity another time, but he declined.

{¶ 21} Consistent with the interviews, Ramirez admitted at trial that he and L.P. engaged in "dry-humping" on July 4, 2021. He claimed that L.P. crawled into his bed and initiated it, but insisted that he had been in a dream-like state due to intoxication. As with N.R., Ramirez maintained that L.P. made the allegations against him because she did not like his girlfriend.

### D. Ramirez Appeals.

{¶ 22} Ramirez's convictions and sentences were memorialized in a judgment journalized on August 2, 2024. Ramirez appealed. He assigns the following errors for our review:

> Assignment of Error No. 1: The State Violated Mr. Ramirez's Due Process Rights Under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution by Failing to Preserve a Recording of His Interview with Special Agent Pieja, Depriving Him of a Fair Trial.

> Assignment of Error No. 2: Mr. Ramirez's Convictions for Rape and Gross Sexual Imposition Are Against the Manifest Weight of the Evidence, Depriving Him of Due Process Under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

> Assignment of Error No. 3: The Trial Court Erred by Failing to Sua Sponte Declare a Mistrial or Provide a Curative Instruction After the State's Improper Closing Arguments, Which Appealed to the Jury's Emotions, Misstated the Evidence, and Introduced Extraneous Material, Depriving Mr. Ramirez of a Fair Trial in Violation of His Due Process Rights Under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

9.

## II. Law and Analysis

{¶ 23} Ramirez claims error in Agent Pieja's failure to record his interview. He argues that his convictions are against the manifest weight of the evidence. And he maintains that statements made in the State's closing argument warranted the sua sponte declaration of a mistrial.

### A. Failure to Record Interview

{¶ 24} In his first assignment of error, Ramirez argues that the State violated his right to due process by failing to preserve a recording of his interview with FBI Special Agent Pieja. Ramirez maintains that the failure to preserve the recording prevented him from effectively challenging the State's trial evidence.

{¶ 25} The State responds that this is not a matter of failing to preserve evidence because the evidence never existed in the first place. It urges us to reject the analysis that Ramirez asks us to conduct relating to the duty to preserve existing evidence. The State claims that the legal issue here is whether Ramirez had a constitutional right to have his interview recorded. It maintains that he did not.

{¶ 26} Ramirez concedes that he did not raise this objection at trial, therefore, we review for plain error. Plain error is error that affects substantial rights. Crim.R. 52(B). To demonstrate plain error under Crim.R. 52(B), the party asserting error has the burden of demonstrating "that an error occurred, that the error was obvious, and that there is a reasonable probability that the error resulted in prejudice, meaning that the error affected the outcome of the trial." *State v. Echols*, 2024-Ohio-5088, ¶ 50, citing *State v. Knuff*,

10.

2024-Ohio-902, ¶ 117. We will reverse for plain error "only in 'exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Bond,* 2022-Ohio-4150, ¶ 18, quoting *State v. Long*, 53 Ohio St.2d 91, (1978), paragraph three of the syllabus.

{¶ 27} Agent Pieja made clear that portions of the interview that he was permitted to record were not recorded because the battery on the recording device died. This was not a matter of the State failing to preserve evidence that was in existence; it was a technical error that prevented him from recording the interview in the first place. The State is correct that the Ohio Supreme Court has recognized that "[n]othing in the federal or Ohio Constitution requires that confessions or police interviews be recorded." *State v. Osie,* 2014-Ohio-2966, ¶ 109, *State v. Smith,* 80 Ohio St.3d 89, 106 (1997). Thus it is clear that the failure to record Ramirez's interview violated no constitutional right. Accordingly, no due-process violation—and no plain error—occurred.

{¶ 28} We find Ramirez's first assignment of error not well-taken.

### B. Manifest Weight

{¶ 29} In his second assignment of error, Ramirez argues that his convictions are against the manifest weight of the evidence. When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial

11.

ordered. *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997). We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 2012-Ohio-6068, ¶ 15 (6th Dist.), citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 30} Ramirez claims that his convictions are against the manifest weight of the evidence because there were significant inconsistencies in the victims' testimony, there was no physical corroborating evidence, and the victims' allegations were contradicted by Ramirez's own testimony.

{¶ 31} First, Ramirez complains that the victims' testimony contained inconsistencies that undermined their credibility because (1) N.R.'s timeline was unclear because she initially estimated that the events giving rise to Counts 2 and 3 occurred in seventh or eighth grade, but later adjusted her ages to 11 and 12 during rebuttal, raising doubts about the accuracy of her recollection; (2) A.P. testified that Ramirez "dry-humped" her on October 3, 2021—a date she confirmed because of a saved TikTok video—but admitted on cross-examination that she originally gave a different date to the detective; and (3) L.P. could not recall the exact date of her alleged assault, estimating that it occurred in the summer of 2021, and she provided only minimal details.

12.

{¶ 32} Second, Ramirez argues that the State presented no physical evidence to corroborate the victims' allegations, "despite the nature of the charges suggesting such evidence might exist." He complains that the State offered no DNA evidence, rape kits, or medical examinations to substantiate the victims' claims, thus casting doubt on the reliability of their testimony.

{¶ 33} Third, Ramirez's argues that his own testimony directly contradicted the State's evidence and provided a credible alternative narrative that the jury failed to properly weigh. Ramirez maintains that "he never engaged in any sexual activity with N.R., A.P., or L.P.," and he denied digital penetration, clarifying that the blood on his finger was not related to penetration. He emphasizes that Am.R. admitted to bias against Ramirez, he highlights that An.R. did not witness any sexual activity, and he insists that the lack of a recording prevented the jury from independently assessing the accuracy of the statements attributed to him. Ramirez also insists that the victims had motive to fabricate the allegations against him.

{¶ 34} The State responds that this is not the exceptional case requiring reversal. It observes that Ramirez pointed to a single consistency in N.R.'s timeline, which it claims was understandable given her age at the time of the assaults, the passage of time, and the sheer number of assaults. It disputes that A.P.'s testimony contained inconsistencies. The State argues that the absence of corroborating DNA or medical evidence does not render a verdict against the manifest weight of the evidence, and it maintains that there *is* physical evidence corroborating N.R.'s allegations—her electronic

13.

journal, which was admitted after Ramirez claimed that N.R. fabricated her allegations because she disliked Ramirez's girlfriend. Moreover, the State claims, Ramirez himself confirmed that the incidents occurred, but denied only that he was the aggressor. Finally, the State disputes that Ramirez offered a "credible alternative narrative."

{¶ 35} As to alleged inconsistencies in the witnesses' testimony, the supposed motive for fabricating the accusations against Ramirez, and the "alternative narrative" supplied by Ramirez, these were all credibility issues for the jury to weigh. Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). "The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts." *State v. Hill*, 2024-Ohio-2744, ¶ 24 (7th Dist.), citing *State v. Barnhart*, 2010-Ohio-3282, ¶ 42 (7th Dist.), citing *State v. Mastel*, 26 Ohio St.2d 170, 176 (1971). "When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible." *Id.,* citing *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999).

{¶ 36} Here, we cannot conclude that the jury clearly lost its way in resolving evidentiary conflicts in a manner adverse to Ramirez. It was reasonable for the jury to

14.

find it incredible that N.R. and L.P. initiated sexual activity with Ramirez, to disbelieve that he never penetrated N.R.'s vagina or engaged in sexual activity with A.P., and to reject his suggestion that the victims had motive to fabricate the allegations.

{¶ 37} Ramirez claims that "he never engaged in any sexual activity with N.R., A.P., or L.P." But during his recorded interview with Detective George and in his trial testimony, Ramirez very clearly admitted that he engaged in sexual activity with N.R. and L.P. As to N.R., Ramirez testified at trial: "Q: [Y]ou still admit that six sexual encounters occurred with [N.R.]; correct? A: Yes." In his recorded interview, he stated, "She would put my hand down her pants and she did this about six times and she took my hand and rubbed it on her genitals . . . [and] I didn't stop it." As to L.P., he testified at trial: "Q: You've already testified you admitted you humped her, [L.P.]? A: Yes."

{¶ 38} Finally, despite Ramirez's contention that the absence of physical evidence casts doubt on the reliability of the victims' testimony, it is well-recognized that the State does not need to present physical or scientific evidence of rape. *State v. Dade*, 2020-Ohio-4545, ¶ 28 (6th Dist.); *State v. Ahreshien,* 2021-Ohio-1223, ¶ 36 (6th Dist.). Moreover, given that the rapes here were reported almost two years after the last incident occurred, it is difficult to understand why Ramirez would claim that physical evidence may exist. In any event, the absence of physical evidence was a factor the jury could consider, but it did not demand a contrary outcome here.

{¶ 39} We find Ramirez's second assignment of error not well-taken.

15.

## C. Closing Arguments

**{¶ 40}** In his third assignment of error, Ramirez argues that the trial court erred by failing to sua sponte declare a mistrial or provide a curative instruction after the State made improper remarks during its closing arguments that appealed to the jury's emotions, misstated the evidence, and introduced extraneous material not in the record. He maintains that these instances of prosecutorial misconduct violated his due-process rights because they inflamed the jury and shifted focus from the evidence to sympathy and improper credibility judgments, depriving him of a fair trial.

**{¶ 41}** When an appellant alleges that the prosecutor made improper statements during closing argument, we review the argument in its entirety to determine whether the remarks were prejudicial. *State v. Patton*, 2015-Ohio-1866, ¶ 154 (6th Dist.), citing *State v. Slagle*, 65 Ohio St.3d 597, 607 (1992), and *State v. Moritz*, 63 Ohio St.2d 150, 157 (1980). But where, as here, a defendant fails to object to a prosecutor's comments, we review the comments only for plain error. *State v. Boaston*, 2017-Ohio-8770, ¶ 82 (6th Dist.). "Specific to allegations of prosecutorial misconduct, under a plain error standard, a reviewing court asks whether a defendant would not have been convicted in the absence of the improper conduct." (Internal quotations, citations, and brackets omitted.) *State v. Abdullahi,* 2024-Ohio-418, ¶ 29 (10th Dist.).

**{¶ 42}** Ramirez cites three examples of allegedly problematic statements by the State's attorney.

{¶ 43} First, Ramirez claims that the State improperly appealed to the jury's emotions by saying: "You saw their body language. You saw their embarrassment. You heard the inflection in their voices. You saw their eye contact." He argues that the State encouraged jurors to focus on the victims' demeanor rather than the substance of their testimony, imploring the jury to convict based on sympathy rather than evidence.

{¶ 44} The State responds that it simply reminded the jury to use the tests of truthfulness they use in their daily lives, and this reminder was consistent with the court's instructions. It also points out that the trial court instructed the jury not to be influenced by sympathy or prejudice and jurors are presumed to follow the court's instructions.

{¶ 45} We conclude that this statement was not improper. We agree with the State that it was a mere reminder to the jurors to use the tools they employ in everyday life to assess credibility. In fact, it summarizes the reason we often defer to the jury's credibility determinations—i.e., the jurors have the advantage of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *Fell,* 2012-Ohio-616, ¶ 14 (6th Dist.).

{¶ 46} Second, Ramirez takes issue with the following comment by the State's attorney: "You would have to believe that Special Agent Pieja got on the stand and committed perjury to create that hearsay this week. A federal agent who's worked for the Bureau for 16 years." This statement was made in the context of refuting Ramirez's trial testimony where (1) he denied saying that his hand smelled like N.R.'s vagina, and (2) he

17.

claimed that the marking he made on the post-it note was not intended to represent how far he inserted his finger into N.R.'s vagina, but rather to indicate where on his hand he saw blood. Ramirez maintains that the State's remark "improperly bolstered Pieja's credibility and misstated the burden of proof, implying that the jury had to find Pieja committed perjury to believe Mr. Ramirez, rather than evaluating the evidence under the reasonable doubt standard."

{¶ 47} The State disputes that its statements during closing argument constituted improper "vouching" for Agent Pieja's credibility. It emphasizes that it never expressed an opinion about his credibility. It insists that it only "suggested that the evidence indicated that Agent P[i]eja's testimony was credible."

{¶ 48} Improper vouching occurs where the prosecutor expresses his or her personal belief about the witness's credibility. *State v. Davis*, 2008-Ohio-2, ¶ 241. Here, we do not necessarily agree with the State that its attorney merely "suggested that the evidence indicated that P[i]eja's testimony was credible." But neither do we find that the remark constituted improper vouching. The State's attorney never expressed her view that Agent Pieja was telling the truth. Rather, she essentially told the jury that to accept that Ramirez's testimony was truthful, it must find that Agent Pieja's testimony was untruthful. Although the implication may have been that Pieja, an FBI agent with 16 years of service, was more likely to be telling the truth, the State's remark fell well short of improper vouching.

18.

{¶ 49} Finally, Ramirez claims that it was improper for the State's attorney to use a personal anecdote during closing argument. Specifically, the State's attorney introduced a personal anecdote about his son failing to admit that he lost his dad's credit card until it became so obvious that he was forced to admit it. He analogized this to Ramirez denying the evidence against him until he couldn't anymore, then spinning it to suggest that the victims initiated the sexual contact. Ramirez insists that this anecdote introduced extraneous material into the case, risking confusion and prejudice.

{¶ 50} The State responds that the prosecutor's story simply illustrated its argument that Ramirez could not deny the wealth of evidence against him. It disputes that the anecdote was confusing and misleading. It also emphasizes that the jury was instructed that closing arguments do not constitute evidence, and it distinguishes cases cited by Ramirez involving far more egregious conduct.

{¶ 51} In *State v. Belcher,* 2013-Ohio-3142, ¶ 31 (8th Dist.), the defendant was accused of robbing an off-duty police officer at gunpoint and taking his wallet, which contained his police badge. The defendant was later found with the badge and prosecuted for the robbery. During closing, the prosecutor told a personal story about finding a 1997 American league championship ring under the carpet of his house, but returning it to the owner because he knew it did not belong to him. He then suggested that the defendant would not have found a police badge and carried it around unless he had "earned it" by committing the crime. The defendant argued that the telling of this personal anecdote constituted prosecutorial misconduct. The Eighth District disagreed. It concluded that

19.

"[a]lthough the story was not based on evidence in the record, the story did not deprive Belcher of a fair trial." *Id*. at ¶ 32.

{¶ 52} We reach the same conclusion here. The practice of analogizing a personal story with the case being tried carries some risk and may be ill-advised. Nevertheless, there was nothing confusing or prejudicial about the personal anecdote recited by the prosecutor here, and we do not find the remark improper. In any event, challenged comments from closing arguments must be considered in the context of the entire closing argument. *State/City of Toledo v. Reese,* 2018-Ohio-2981, ¶ 33 (6th Dist.). Here, when considered in the context of the entire closing argument, we find that the State's use of the personal anecdote was not prejudicial to Ramirez. Moreover, we cannot say that Ramirez would not have been convicted in the absence of the statement.[1]

{¶ 53} We find Ramirez's third assignment of error not well-taken.

### III.  Conclusion

{¶ 54} There is no constitutional right to have one's police interview recorded. We find Ramirez's first assignment of error not well-taken.

{¶ 55} Ramirez's convictions were not against the manifest weight of the evidence. The jury was presented with two conflicting versions of events and made appropriate credibility determinations in deciding which version it believed. This is not

---

[1] We observe that defense counsel also used a personal anecdote during his closing argument.

20.

the exceptional case requiring reversal. We find Ramirez's second assignment of error not well-taken.

{¶ 56} The State's remarks during closing were not improper. The State did not appeal to the jurors' emotions, it did not improperly vouch for Agent Pieja's credibility, and its use of a personal anecdote was not confusing or prejudicial. In any event, when considered in the context of the entire closing argument, we cannot say that the outcome of the proceedings would have been different absent the remarks. We find Ramirez's third assignment of error not well-taken.

{¶ 57} We affirm the August 2, 2024 judgment of the Lucas County Court of Common Pleas. Ramirez is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J. _____

_____
JUDGE

Myron C. Duhart, J. _____

Charles E. Sulek, P.J. _____
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.