[Cite as *State v. Koonce*, 2026-Ohio-1165.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                     Court of Appeals No.  {48}L-25-00060

    Appellee                              Trial Court No.  CR0202401447

v.

Deandre Koonce                           **DECISION AND JUDGMENT**

    Appellant                             Decided: March 31, 2026

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

William C. Livingston, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Deandre Koonce, appeals the April 3, 2025 judgment of the

Lucas County Court of Common Pleas sentencing him to 18 years to life in prison.  For

the following reasons, we affirm.

**I. Background and Facts**

{¶ 2} This case arose from the March 3, 2024 shooting of C.A. at an after-hours

motorcycle club in Toledo.  Koonce was charged with one count each of murder in

violation of R.C. 2903.02(A), an unclassified felony (count 1); murder in violation of

R.C. 2903.02(B), an unclassified felony (count 2); and felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony (count 3). Each charge carried a three-year firearm specification under R.C. 2941.145(A).

## A. Suppression

{¶ 3} Before trial, Koonce moved to suppress evidence of his statements to the police because the officers did not obtain a valid waiver of his rights, the interrogation continued despite him invoking his right to counsel, and the audio of his interview was destroyed, which amounted to bad faith by the Toledo Police Department.

{¶ 4} The trial court held a suppression hearing at which the State called TPD detective Justin Hawkins to testify. Hawkins testified that he interviewed Koonce on March 20, 2024, as part of the investigation into a murder that happened on March 3, 2024. Sergeant Roy Kennedy was in the interview with him. The interview was electronically recorded, but the audio "cut out" right before the interview began, so there is no sound for much of the recording.

{¶ 5} At the beginning of the interview, Hawkins reviewed a waiver of *Miranda* rights form with Koonce. He identified a waiver form that Koonce signed before speaking with the detectives. Koonce did not appear intoxicated, and Hawkins did not yell at him before the waiver was signed. Hawkins estimated that Koonce waited about 10 to 15 minutes in the interview room before Hawkins presented him with the waiver and said that he did not threaten Koonce to obtain his signature. Koonce did not request to speak with an attorney or ask to stop the interview at any point before or after signing the waiver form.

2.

{¶ 6} Hawkins prepared a report summarizing the interview and denied fabricating anything in it.

{¶ 7} On cross-examination, Hawkins testified that he thinks it is important to record statements because that is "the most accurate way of showing an interview." When Hawkins knows that an interview is not being recorded, he takes "more specific" notes. He thought that a week or two elapsed between the interview and when he typed up his report. He was unsure of how many other interviews he conducted between Koonce's interview and writing the report about Koonce's interview.

{¶ 8} Regarding the shooting, Koonce initially said that he left the scene when the fighting started, but after the detectives told him that they had video, he admitted that he "was involved in it, but he said he didn't know anything about the shooting itself." When the detectives "let him know it was on video and [they] were aware of what happened and that [they] were sure that he had some involvement[,]" Hawkins recalled Koonce saying, "I'm going to get in trouble for this or I'm going to do some time . . . and then he admitted to shooting [C.A.]." This was not in Hawkins's notes, but it was something "that really stuck out to [him]" because suspects do not usually admit to what they have done, even in the face of video evidence, and Hawkins remembered Koonce saying things like "I messed up" and "I'm a man, I'm going to fess up to it." Those comments stuck out to Hawkins because he "never hear[s] that, and this is the first time [he has] heard that."

{¶ 9} Regarding the recording of the interview, Hawkins explained that the recording system was a newer system that allowed others to listen to interviews from

3.

other rooms, and "with the configuration of the buttons on the old system versus the new system that at some point someone turned off that microphone accidentally trying to get the sound into the room next door where people will watch . . . ."

{¶ 10} On redirect, Hawkins denied any bad faith on TPD's part related to the unrecorded audio. He also acknowledged that not every detail of the interview was in the notes he used to prepare his report but said that he did not change the gist of what Koonce told him. Koonce did not tell the detectives that he shot C.A. to defend himself or someone else.

{¶ 11} At the conclusion of the hearing, the trial court denied Koonce's motion. It found that R.C. 2933.81(B) required the recording of an interview in a murder case, but there was an exception when the equipment malfunctions. Based on the video, Koonce did not appear to be coerced into confessing. The court made that determination based on Koonce's facial expressions. It also determined that Koonce knowingly, voluntarily, and intelligently signed the *Miranda* waiver. It found that there was a reasonable explanation for the lack of audio on the recording and no indication that Hawkins was being untruthful.

{¶ 12} In its written decision denying the motion to suppress, the trial court determined from the totality of the circumstances that Koonce knowingly, voluntarily, and intelligently waived his *Miranda* rights.

{¶ 13} Regarding the recording of the interview, the court found that R.C. 2933.81 applied. That statute requires that all oral statements made by a suspect in a murder case during a custodial interrogation in a place of detention be recorded. However, there is an

4.

exception when the recording equipment malfunctions. The court determined that the recording equipment in this case "simply malfunctioned or failed" and there was no evidence that Hawkins was being dishonest about what he recalled from the interview. Therefore, the trial court denied Koonce's motion to suppress.

### B. Trial

{¶ 14} Koonce's case was tried to a jury. At trial, the State presented the testimony of TPD officer Cristopher Guanilo; detectives Michael Talton, Dylan James, and Hawkins; and sergeant Kennedy; and Lucas County deputy coroner, Dr. Dwayne Wolf. Koonce presented the testimony of his significant other, Antoinette, and his stepsister, Victinia.

### 1. State's case

{¶ 15} The State began its case by playing the 911 call that reported the shooting. In it, a woman reports that her brother has been shot in the chest. She does not know who shot him.

{¶ 16} Guanilo testified that he responded to a call for a person shot on March 3, 2024. When he arrived on the scene, he saw a man on the ground with two women around him. He asked the women if the shooter was still present and checked to see if anyone was still in the building. After securing the scene, Guanilo noticed that the man on the ground appeared to have been shot, so he rendered first aid by performing CPR. He eventually noticed that the man did not have a pulse, so he stopped performing CPR, secured the witnesses who were near the man, and waited for other officers to arrive to

5.

assist with the scene. After Guanilo did those things, EMS arrived and took the man to the hospital.

{¶ 17} Talton testified that he is a member of TPD's crime scene investigation unit. He responded to the scene of the shooting on March 3, 2024, to document the scene and collect evidence. The scene where the shooting took place was an after-hours club. He took photographs and collected evidence, including a surveillance system.

{¶ 18} On cross-examination, Talton testified that he collected a live 9-millimeter cartridge and a spent 9-millimeter shell casing from the club. He also collected two 9-millimeter handguns from two purses found inside the club and a black baseball cap from a trashcan inside the club.

{¶ 19} Wolf testified that he performed the autopsy on C.A. C.A. had a gunshot wound to the torso and a small abrasion on his left ring finger, but did not have any other injuries, aside from medical intervention markings, like a surgical incision. The gunshot's entrance wound was on C.A.'s back and the exit wound was on his chest. The bullet entered the right side of C.A.'s back under his eighth rib, went through the lower and upper lobes of his right lung, and exited under his fourth rib in the front. The toxicology tests that Wolf ordered showed that C.A. had a blood alcohol level of .159 and had THC and methamphetamine in his system. Wolf certified the cause of death as a gunshot wound to the torso and determined the manner of death was homicide.

{¶ 20} On cross, Wolf confirmed that the only injury aside from the gunshot wound that he found on C.A.'s body was the small abrasion on his finger. He also

6.

confirmed that he was not able to determine whether the person who shot C.A. acted in self-defense.

{¶ 21} James testified that he conducted a traffic stop of a vehicle that Koonce was driving on March 20, 2024. He found a black and gray Harley Davidson coat inside the vehicle.

{¶ 22} Kennedy testified that he responded to the shooting on the morning of March 3, 2024. He learned that C.A. was found outside in a grassy area adjacent to the building housing the after-hours club with no weapons on him. He determined that the shooting happened inside the building. Inside the building, he noticed a strong odor of bleach, which suggested that someone had been cleaning. He also noticed a trail of blood from inside to outside, a spent shell casing, a live cartridge, and numerous cameras but no DVR equipment. He later found a DVR, from which videos were recovered, hidden in an upstairs bedroom.

{¶ 23} Kennedy identified Koonce as the murder suspect and said that he and Hawkins interviewed Koonce. At the time of the interview, TPD had recently installed a new recording system, and a lieutenant who wanted to listen to the interview from his office inadvertently disabled the audio recording, leaving the video without audio after the first ten minutes. In the video, Koonce wears a balaclava-style head covering similar to the one worn by the shooter in the surveillance video recovered from the club, and the jacket recovered from Koonce's vehicle appeared consistent with the jacket Koonce wore the night of the shooting.

7.

{¶ 24} According to Kennedy, Koonce first told them during his interview that he got to the club around 3:00 or 4:00 a.m. to meet his girlfriend, Antoinette, a fight broke out, he heard a gunshot, and he "left immediately to stay out of the way." However, after the detectives told him that the incident was on video, Koonce admitted that he shot C.A. Koonce said the incident started over a fight. C.A. was acting aggressively toward and "harassing" Antoinette and her friend. C.A. "threw a drink on them and threatened to beat up the female and even challenged Mr. Koonce to say that there's nothing you can do about it, and then so a fight broke out . . . right there on the spot." When Kennedy asked Koonce why he shot C.A., Kennedy reported that "the statement was made that [C.A.] was a civilian, he wasn't a member of the motorcycle club, so for a civilian to be in the club acting this [sic] in that manner, he needed to be taught a lesson essentially." Koonce never said that he was defending anyone inside the club. When Kennedy asked where the gun used in the shooting was, Koonce "said that we'll never find it." Officers never recovered the firearm in the course of their investigation.

{¶ 25} On cross-examination, Kennedy confirmed that the strong smell of bleach suggested that someone had been cleaning. Despite someone allegedly cleaning, he still found a spent casing and a live round. He also recalled officers finding one weapon at the scene.

{¶ 26} Regarding Koonce's interview, Kennedy confirmed that the audio recording was inadvertently disabled by the lieutenant who wanted to listen in on the interview. He explained that the button on TPD's new recording system that allowed remote listening and the button that disabled the microphone were right next to each other

8.

so "you can simultaneously turn on the sound to the room to hear the live feed while turning off the microphone on the recording, and you wouldn't know that the microphone was off unless you're actually looking at the monitor at that particular time."

{¶ 27} Kennedy generally takes limited notes during recorded interviews, which was true here. Instead, he focused on listening to Hawkins's questions and jotting down follow-up questions. Thus, his testimony about Koonce's statements was based mostly on his memory from one year earlier. He specifically remembered Koonce saying that C.A. was a "civilian"—i.e., not a member of a motorcycle club—when he asked why Koonce shot C.A. When Kennedy asked Koonce if he felt there was any danger, Koonce "hesitate[d] briefly and said, yeah, there was a little danger, but he didn't really elaborate on it." He believed that he asked Koonce if C.A. was armed, and Koonce "never said that he saw [C.A.] with a gun."

{¶ 28} Koonce described the fight that morning as the background that explained how Koonce got to the point of shooting C.A. Koonce also noted that C.A. had "stated things about [Koonce] in the past but he's always shrugged it off . . . ."

{¶ 29} Kennedy confirmed that the surveillance video showed a fight on the ground, with a woman on top of C.A., hitting him. It also shows Koonce drawing a gun, appearing to rack the slide, then approaching, tapping the woman on top of C.A., and firing the gun while the fight continued.

{¶ 30} Hawkins testified that he was the lead investigator for this case. The day after the shooting, he received two tips identifying a possible suspect nicknamed "Little," possibly with the last name Koonce, described as a light-skinned Black male of thinner

9.

build and linked to a specific motorcycle club. He was able to obtain a picture of the shooter from the surveillance video taken from the club. He then searched the motorcycle club's Facebook page, found an account for "Deandre Koonce," and found pictures consistent with the pictures of the suspect.

{¶ 31} Officers recovered one spent 9-millimeter casing and one live 9-millimeter round on the floor of the club near the bar. Both were sent for DNA testing, but there was insufficient DNA on them for any type of identification. They also recovered other firearms at the club that had no evidentiary significance to this case.

{¶ 32} Hawkins reviewed some of the surveillance video taken from the club. In it, he identified Koonce, Victinia, and C.A. Using one camera view, he explained that Victinia and C.A. argued, Victinia stood and swung at C.A. with her left hand, and moments later C.A. "smacked" a drink into Victinia's face. At this point, there was a "mad scramble" as everyone at the table moved toward C.A. Following the scramble, C.A. and Victinia were engaged in a struggle. While that was going on, Koonce stepped back from the fray and reached toward his waist or vest. Meanwhile, C.A. and Victinia's fight moved toward the bar, knocking down another patron. Victinia was hitting C.A. as they fell to the ground, and Koonce was reaching toward Victinia. Hawkins also saw a heavyset motorcycle club member appear to pull out an object that he thought could be a pistol and strike downward. Hawkins then identified a frame where Koonce extended his left arm and a visible muzzle flash occurred, after which people backed away.

10.

{¶ 33} Using another camera view, Hawkins explained that C.A. was leaving the club with blood visible on his person. Koonce was following, putting a pistol in his left hand near his vest or waistband as he walked toward the front of the club.

{¶ 34} In a third camera view, C.A. exited through the front door, Koonce stood on the stairs, C.A. collapsed on the ground, and Koonce returned inside.

{¶ 35} Hawkins obtained a traffic camera image of a motorcycle registered to Koonce from about two weeks before the shooting that showed a rider wearing a jacket consistent with the jacket the shooter is wearing in the surveillance video.

{¶ 36} On March 20, 2024, Koonce was stopped for a traffic violation, arrested, and brought in for an interview. He was placed in an interview room, Mirandized with a written waiver that he signed, and then questioned by Hawkins and Kennedy. They began the interview by asking about the after-hours club and a fire that happened there soon after the shooting. Koonce knew about the fire and said it was retaliation for the shooting. Koonce also admitted to being present at the time of the shooting. Initially, he said that he and Antoinette left the club when a fight broke out. However, after the detectives told him that there was video of the incident, he admitted to involvement in the altercation but denied knowledge of the shooting and again claimed that they left after the fight. When the detectives told him that they had "very good" video and that they knew he should have some knowledge of the shooting, Koonce "kind of hesitated or thought for a minute and he said he was going to go away for a long time for this, and he admitted to shooting [C.A.]." According to Hawkins, Koonce said that the gun he used in the shooting "is gone, you're not going to find it." At no point during the interview did

11.

Koonce say that he shot C.A. in self-defense or in defense of someone else. When asked "if he felt like there was any danger involved during the fighting . . . he took a moment and then he did say, yeah, maybe a little." Koonce explained that he shot C.A. because motorcycle clubs are like family, C.A. was a civilian who came in and caused problems, and C.A. needed to be taught a lesson.

{¶ 37} In addition to interviewing Koonce, Hawkins attempted to interview other people who were at the club, but those he contacted were unable to provide useful details. Antoinette initially declined to speak with him, but he eventually interviewed her in November 2024. Around the same time, he finally identified Victinia and spoke to her. Although the women's statements provided some clarity about the events surrounding the shooting, they did not change Hawkins's view that Koonce should be charged with C.A.'s murder.

{¶ 38} On cross-examination, Hawkins confirmed that he was unable to identify a person he knew only as "Soldier," and acknowledged that he did not include that nickname in his report. He admitted that his report did not document Koonce's statement that the gun was gone. He also failed to document some of his early attempts to contact Victinia because he was not sure of her identity at the time. Although Hawkins interviewed multiple witnesses, none of them were subpoenaed or in court during the trial. He verified during Koonce's interview that "Little" was Koonce's nickname. He identified a woman in the video as Ashley, a relative of Victinia's, but he did not contact her.

12.

{¶ 39} Hawkins took notes during the interview as if the interview were being recorded. Within a week or two of the interview, he used his notes and his memory to create his report.

{¶ 40} Hawkins confirmed that he found two guns and a live 9-millimeter round at the club and saw one person, or possibly two people, with a gun on the video. He could not say whether people commonly carried weapons at the club. He agreed that several club patrons were intoxicated, and C.A. had alcohol, THC, and methamphetamine in his system. He acknowledged having seen erratic behavior in meth-intoxicated subjects.

{¶ 41} Hawkins said that he never told Koonce that the officers had a video of him shooting C.A., only that there was video showing that he would have knowledge of the shooting, after which Koonce admitted to shooting C.A. by saying something along the lines of "I'm going to go away for a long time for this . . . ." He recalled Koonce saying that C.A. had previously said things about him, which Koonce shrugged off. Koonce did not claim that C.A. said anything to him that night. Koonce waived his *Miranda* rights, spoke to the detectives voluntarily, and could have stopped the interview at any time.

{¶ 42} Following Hawkins's testimony, the State rested.

{¶ 43} At the end of the State's case, Koonce moved for acquittal under Crim.R. 29. The trial court denied his motion.

### 2. Koonce's case

{¶ 44} Antoinette testified that she, Victinia, and Victinia's cousin, Ashley, went to a party before going to the club the morning of the shooting. They got to the club after 5:00 a.m. At first, they were "having a time . . . in [their] own little space minding [their]

13.

business . . . enjoying [their] time." Koonce did not go to the club with Antoinette; he came there later.

{¶ 45} Antoinette did not know C.A. at the time of the shooting, but she had some interactions with him at the club. Defense counsel had Antoinette review the surveillance video from the club. Antoinette's interaction with C.A. started when C.A. was talking to a woman whom Antoinette did not know. Antoinette thought the woman looked bothered by C.A., so she asked if the woman knew C.A. She said that she did not. After that, C.A. "tapped [Antoinette's] leg. You know how dudes be trying to hit on you." Antoinette told him, "I'm fine, stop, I'm cool[,]" but C.A. would not leave her alone. Eventually, C.A. walked away.

{¶ 46} About 10 minutes later, C.A. walked back to where Antoinette, Victinia, and Ashley were sitting, picked up Ashley's drink, drank from her cup, and put the cup back on the table. Then he walked over to Victinia, "pointing like what's up with her . . . what is up with her, pointing at [Antoinette]. Nothing was up." Victinia was also saying that Antoinette was "cool, just go ahead." C.A. then said "slick, smart stuff" to Victinia. Antoinette specifically heard him say "I bet your brother won't do nothing if I do something to you. Like, if I do something to you, like, nothing is going to happen to me." After that, C.A. and Victinia started to get "aggressive" with each other. C.A. spit in Victinia's face, and then Victinia took a swing at C.A.

{¶ 47} At some point during C.A. and Victinia's altercation, Victinia fell to the floor and was lying there for a minute. Ashley helped her up, but she "was still falling around." C.A. "never stopped fighting her." Antoinette told C.A. to leave her alone

14.

"[l]iterally more than 10 times . . . ." C.A. talked to Victinia for approximately two or three minutes; C.A. was "nothing but persistent," and Victinia "don't want to be bothered." While C.A. and Victinia were fighting, Antoinette could not tell who was on top and who was on bottom.

{¶ 48} On cross, Antoinette said that she did not see Koonce shoot C.A.

{¶ 49} She referred to C.A. as a "civilian," meaning that he was not a member of a motorcycle club, and said that a civilian in a motorcycle club "should act like they have some sense . . ." and should know who they are talking to.

{¶ 50} After the shooting, Hawkins tried to contact Antoinette, but she did not speak with him until many months later. She spoke with defense counsel before speaking to Hawkins and before testifying.

{¶ 51} Victinia, Koonce's stepsister, testified that she went to the club with Antoinette, Ashley, and Koonce the morning of March 3. When they got to the club, they sat at a table for a while before anything happened. Eventually, C.A. was trying to talk to Antoinette, but she was not interested in having a conversation with him. C.A. was tapping her leg, she was telling him that she did not want to talk, and C.A. "end up getting on the table." C.A. then fell into Victinia and asked her "what was up with Antoinette and do she have a boyfriend[.]" Victinia told him that she did, her boyfriend was standing nearby, and "to back up off of [Victinia]." After Victinia asked C.A. to "back up off [her], get out of [her] face, he continued to try and talk to [her] . . . . Then he end up asking [her] what was wrong with [her] and what was the problem." Victinia continued to ask C.A. to get out of her face, and he "just kept coming after [her]." She

15.

told him to leave her alone three times. C.A. "wouldn't get out of [her] face. He thought it was funny. He kept laughing." After that, C.A. spit in Victinia's face, so she punched him. C.A. hit her back, and she fell. Victinia got back up, pushed through the men in front of her, grabbed C.A. by the back of the shirt, and "was punching him in the back of the head all the way up until [they] fell into the bar stools." Once they fell, C.A. got on top of Victinia. However, he "wasn't really trying to hit [her]; he knew [she] was a female." While C.A. was on top of her, Victinia heard a gunshot, and then C.A. jumped off of her. Victinia was not hurt in the altercation. She did not think to call the police because she did not realize at the time that C.A. was the person who was shot. She also did not know that Koonce was the shooter.

{¶ 52} On cross-examination, Victinia agreed that C.A. annoyed her and spit on her at the club. She admitted to punching him more than once but did not recall punching him while he was on the ground. She confirmed that she did not sustain any injuries in the fight. She also confirmed that she did not talk to police for many months after the shooting.

{¶ 53} Following Victinia's testimony, Koonce renewed his Crim.R. 29 motion, which the trial court denied. Then, Koonce rested.

### C. Jury instructions

{¶ 54} In its instructions, before instructing the jury on the substantive offenses, the trial court told the jury,

> Testimony has been admitted indicating that the defendant fled the scene. You are instructed that flight alone does not raise a presumption of guilt, but it may tend to indicate the defendant's consciousness of guilt. If

16.

you find that the facts do not support that the defendant fled, or if you find that some other motive prompted the defendant's conduct, or if you're unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose.

However, if you find that the facts support that the defendant engaged in such conduct, and if you decide that the defendant was motivated by a consciousness of guilt, you may, but are not required to, consider that evidence in deciding whether the defendant is guilty of the crime charged. You alone will determine what weight, if any, to give this evidence.

{¶ 55} As relevant for our purposes, regarding count 1, murder under R.C. 2903.02(A), after defining the elements of the offense, the trial court told the jury,

If you find the State has proven beyond a reasonable doubt all the essential elements of murder as charged in Count 1 of the indictment, then your verdict must be guilty. If you find the State has failed to prove beyond a reasonable doubt any one of the essential elements of the offense of murder as charged in Count 1 of the indictment, then your verdict must be not guilty.

The court then went on to explain the affirmative defense of defense of another. After explaining the elements of the defense, the court said,

If you find that the State proved beyond a reasonable doubt all the elements of murder and that the State proved beyond a reasonable doubt that the defendant did not act in self-defense of another, you must find the defendant guilty. If you find the State failed to prove beyond a reasonable doubt any element of murder, or if you find that the State failed to prove beyond a reasonable doubt that the defendant did not act in defense of another, you must find the defendant not guilty.

The court gave identical instructions for counts 2 and 3.

{¶ 56} The verdict forms the court gave the jury simply asked the jury to determine for each count whether Koonce was "guilty" or "not guilty"; the verdict forms did not separately ask the jury to make a determination about defense of another.

17.

## D. Outcome and sentencing

{¶ 57} The jury found Koonce guilty of all three charges and firearm specifications.

{¶ 58} At the sentencing hearing, the trial court found that the charges merged for sentencing purposes, and the State chose to proceed on count 1. The court sentenced Koonce to 15 years to life in prison on count 1 and three years in prison on the firearm specification, for an aggregate prison sentence of 18 years to life.

{¶ 59} Koonce now appeals, raising five assignments of error:

1. The trial court committed reversible error in admitting statements allegedly made by Appellant during his unrecorded custodial interview, without providing any cautionary instruction to the jury pursuant to R.C. 2933.81.

2. The trial court committed reversible error in admitting statements allegedly made by Appellant during his unrecorded custodial interview in violation of his constitutional rights against self incrimination, to confront the witnesses against him, and to a fair trial secured under Article I, Sections 10 and 16 of Ohio Constitution.

3. The trial court committed plain error in instructing the jury and in its verdict forms.

4. Appellant was denied his constitutional right to the effective assistance of counsel guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution, when his counsel failed to object to the jury instructions and verdict forms.

5. The jury's verdicts are against the manifest weight of the evidence.

18.

## II. Law and Analysis

### A. The trial court did not commit plain error by failing to give a cautionary instruction under R.C. 2933.81.

{¶ 60} In his first assignment of error, Koonce argues that the trial court erred by admitting the detectives' testimony about the statements he made during his interview without giving the jury a cautionary instruction. He contends that R.C. 2933.81(D) requires a cautionary instruction when a murder suspect's custodial interrogation is not recorded and none of the exceptions in R.C. 2933.81(C) applies. He argues that the trial court incorrectly determined that the recording equipment malfunctioned (the only R.C. 2933.81(C) exception that might apply in this case) because the audio was not recorded due to human error, not an equipment malfunction. Thus, he claims, the trial court should have given the jury a cautionary instruction that "it may consider the failure to record the custodial interrogation in determining the reliability of the evidence." R.C. 2933.81(D)(2).

{¶ 61} The State responds that the trial court did not abuse its discretion by admitting the detectives' testimony about Koonce's statements because R.C. 2933.81 does not provide a basis for excluding testimony. It also contends that the trial court did not commit plain error by failing to give the jury a cautionary instruction because the court's conclusion that the recording equipment malfunctioned was reasonable. Further, the State argues that Koonce has failed to show a reasonable probability that the error prejudiced him because the jurors were told about the normal procedures for taking a suspect's statement and the departure from the norm in this case, and defense counsel

19.

questioned the detectives about their notetaking and the time between the interview and when they summarized it for their report.

{¶ 62} Under R.C. 2933.81(B), "all oral statements made by a person who is the suspect of a violation of or possible violation of . . . [R.C.] 2903.02 . . . during a custodial interrogation in a place of detention shall be electronically recorded." That section does not apply when "[t]he recording equipment malfunctions." R.C. 2933.81(C)(2). If a law enforcement agency fails to record an interview, a court has two options. If the prosecution proves by a preponderance of the evidence that one of the exceptions to recording in R.C. 2933.81(C) applies, the court shall admit the evidence without a cautionary instruction to the jury. R.C. 2933.81(D)(1). But if the prosecution does not prove by a preponderance of the evidence that one of the exceptions to recording in R.C. 2933.81(C) applies, the court "shall provide a cautionary instruction to the jury that it may consider the failure to record the custodial interrogation in determining the reliability of the evidence." R.C. 2933.81(D)(2).

{¶ 63} Under Crim.R. 30(A), "[o]n appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict . . . ." When a defendant fails to object to the jury instructions, we review only for plain error. *State v. Owens*, 2020-Ohio-4616, ¶ 7. "To show reversible error under plain-error review, *see* Crim.R. 52(B), three elements must be met: there must first be a deviation from a legal rule, that deviation must be an obvious defect in trial proceedings, and the deviation must have affected substantial rights[.]" *State v. Gasper*, 2024-Ohio-4782, ¶ 14. Plain error should be found only in "exceptional

20.

circumstances and only to prevent a manifest miscarriage of justice." *State v. Hill*, 92 Ohio St.3d 191, 203 (2001), citing *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 64} Koonce did not object to the trial court's failure to give a cautionary instruction. On appeal, he claims that an objection was unnecessary because once the trial court determined—at the suppression hearing—that the equipment "malfunctioned" under R.C. 2933.81(C), "it also conclusively determined that a cautionary instruction would not be provided to the jury." This is not true. The issue of a cautionary jury instruction was never raised at the suppression hearing—which makes sense, given that the judge's ruling was made while exercising its *own* role as factfinder on the motion to suppress. Nonetheless, the fact remains that the trial court did not make *any* ruling—let alone a "conclusive" ruling—regarding a cautionary instruction before trial. Thus, the error was not preserved for appeal, and we must review for plain error. Evid.R. 103(A) ("[A] party need not renew an objection or offer of proof to preserve a claim of error for appeal" only if "the court rules *definitely* on the record, either before or after trial . . . ." (Emphasis added)).

{¶ 65} Here, Koonce cannot show plain error. "Malfunction" means "to function imperfectly or badly," "fail to operate normally," or "[a] fault in the way something works . . . ." *Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/malfunction (accessed Mar. 2, 2026); *Black's Law Dictionary* (10th Ed. 2014). At a minimum, the State showed, through Kennedy's and Hawkins's testimony, that the TPD's recording system functioned "imperfectly or badly." That is,

21.

there was testimony that an imperfect "configuration" of the touchscreen buttons caused someone to accidentally stop the recording, and "you wouldn't know that the microphone was off unless you're actually looking at the monitor at that particular time." In other words, there was no alert that recording had stopped. Although minimal, this testimony suggests that the failure to record stemmed from the imperfect functionality of the equipment itself, and not merely from human mistake.

{¶ 66} Given this testimony, we cannot conclude that the trial court's finding of an "equipment malfunction" under R.C. 2933.81(C) was plainly erroneous. And, because one of the exceptions in R.C. 2933.81(C) applies to Koonce's case, the trial court was not required to give a cautionary jury instruction. R.C. 2933.81(D)(1). Thus, there is no deviation from a legal rule and no plain error present in this case. Koonce's first assignment of error is not well-taken.

### B. The Ohio Constitution does not require statements to be recorded.

{¶ 67} In his second assignment of error, Koonce argues that the trial court violated his rights under the Ohio Constitution against self-incrimination, to confront the witnesses against him, and to a fair trial by failing to suppress the unrecorded statements he made to the detectives. Although Koonce acknowledges Ohio Supreme Court precedent holding that the Ohio Constitution does not require police interviews to be recorded, he urges us to adopt the position of the Hawaii Supreme Court, which recently held that admission of a defendant's unrecorded statements violated his rights under the Hawaii Constitution against self-incrimination, to confront witnesses, and to a fair trial. *See State v. Zuffante*, 157 Haw. 194 (2025).

22.

{¶ 68} The State responds that Koonce waived all but plain-error review of this issue because he did not raise this argument in the trial court. It argues that Koonce cannot show that the trial court committed plain error because the court is bound by the decisions from the Ohio Supreme Court that have held that a defendant has no constitutional right to have his statement recorded. It also points out that we are not bound by the Hawaii Supreme Court case but are bound to follow Ohio Supreme Court precedent.

{¶ 69} Contrary to the State's claim, Koonce did raise the issue of the unrecorded interview violating his state constitutional rights in his motion to suppress and at the suppression hearing, so we are able to review it. However, "the Ohio Supreme Court has recognized that '[n]othing in the federal or Ohio Constitution requires that confessions or police interviews be recorded.'" *State v. Ramirez*, 2025-Ohio-4977, ¶ 27 (6th Dist.), quoting *State v. Osie*, 2014-Ohio-2966, ¶ 109; and citing *State v. Smith*, 80 Ohio St.3d 89, 106 (1997). We are bound to follow Supreme Court precedent. *State v. Fips*, 2020-Ohio-1449, ¶ 10, citing *Smith v. Klem*, 6 Ohio St.3d 16, 18 (1983); and *Merrick v. Ditzler*, 91 Ohio St. 256, 264 (1915). Thus, we find that Koonce was not entitled to have his interview recorded under the Ohio Constitution. Koonce's second assignment of error is not well-taken.

**C. The trial court did not commit plain error when instructing the jury.**

{¶ 70} In his third assignment of error, Koonce argues that the trial court committed plain error when it instructed the jury. First, he contends that the trial court erred by giving a consciousness of guilt instruction in a self-defense case because that

23.

instruction allowed the jury to consider Koonce's actions after he fired his weapon in deciding what he knew at the time he acted. He also contends that the trial court's jury instructions on the substantive offenses were misleading because the court instructed the jury that it had to find Koonce guilty if the state proved all of the elements of each offense beyond a reasonable doubt, without regard for the court's later instructions on defense of another. Further, the court's verdict forms do not refer to defense of another (they only required the jury to make a finding of "guilty" or "not guilty"), and Koonce claims that any argument that rejection of an affirmative defense is inherent in a guilty verdict would not apply to his case because of the way the trial court instructed the jury on the substantive offenses.

{¶ 71} The State responds that it was not plain error for the trial court to instruct on consciousness of guilt because Koonce not only left the scene but also lied to police about his involvement and told police that they would not find the gun he used to shoot C.A., and the instruction was not arbitrary or unreasonable and did not create an improper mandatory presumption of guilt. It also argues that the trial court's instructions on defense of another, when considered as part of the whole jury charge, were not plainly erroneous. Finally, the State argues that the verdict forms were not required to address the affirmative defense, and Koonce has not shown that he was prejudiced.

{¶ 72} Trial courts are charged with giving juries "complete and accurate" instructions that adequately reflect the issues argued in the case before them. *State v. Sneed*, 63 Ohio St.3d 3, 9 (1992). "Requested jury instructions should ordinarily be given if they are correct statements of law that are applicable to the facts in the case, and

24.

reasonable minds might reach the conclusion sought by the instruction." *Miller v. Defiance Regional Med. Ctr.*, 2007-Ohio-7101, ¶ 40 (6th Dist.), citing *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991). Generally, we review a trial court's determination that sufficient facts exist to support a jury instruction for an abuse of discretion. *State v. Hopings*, 2007-Ohio-450, ¶ 35 (6th Dist.). In this case, however, Koonce did not object to the jury instructions he now complains of, so we can review them only for plain error. *State v. Ruetz*, 2023-Ohio-398, ¶ 34 (6th Dist.). In doing so, we review the instructions as a whole to determine whether or not the jury was likely misled in a matter materially affecting the substantial rights of the party who claims error. *Miller* at ¶ 40, citing *Becker v. Lake Cty. Mem. Hosp. West*, 53 Ohio St.3d 202, 208 (1990).

### 1. Consciousness of guilt

{¶ 73} Evidence of flight is admissible to show a defendant's consciousness of guilt. *State v. Williams*, 79 Ohio St.3d 1, 11 (1997). "Flight means some escape or affirmative attempt to avoid apprehension." (Internal quotation omitted.) *State v. Herrell*, 2017-Ohio-7109, ¶ 24 (6th Dist.). To constitute "flight," the defendant must "appreciate that he has been identified as a person of interest in a criminal offense and is taking active measures to avoid being found." *State v. Sanchez-Sanchez*, 2022-Ohio-4080, ¶ 177 (8th Dist.). Under such circumstances, the jury could infer that the defendant "'is avoiding the police only because he or she knows he or she is guilty and wishes to avoid the inevitable consequences of his or her crime.'" *State v. Hennigan*, 2024-Ohio-404, ¶ 50 (11th Dist.), quoting *State v. James*, 2023-Ohio-3524, ¶ 62 (11th Dist.). But

25.

"[f]light is more than merely leaving the scene of the crime . . ." because it is "unrealistic to expect persons who commit crimes to remain on the scene for ready apprehension." *Sanchez-Sanchez* at ¶ 177; *State v. Walter*, 2023-Ohio-2700, ¶ 100 (2d Dist.), quoting *State v. Cargle*, 2019-Ohio-1544, ¶ 48 (2d Dist.) ("[T]o constitute flight, 'it must be clear that the defendant took affirmative steps to avoid detection and apprehension beyond simply not remaining at the scene of the crime.'").

{¶ 74} Based on the evidence before the trial court, we find that the court erred—but did not commit plain error—by providing the jury a consciousness of guilt instruction based on Koonce fleeing the scene of the crime. The only evidence of "flight" is evidence that Koonce left the motorcycle club where the shooting happened after the shooting occurred. But, for a flight instruction to be warranted by the facts, there must be evidence that Koonce did *more than* leave the scene—i.e., there must be evidence that he knew he was implicated in a crime *and* took steps to avoid detection or the consequences of his actions *beyond* not remaining at the club. *State v. Vasquez*, 2024-Ohio-860, ¶ 72 (6th Dist.). Such evidence is simply not present in this case.

{¶ 75} Koonce cannot show that this error prejudiced him, however, so he cannot show that his substantial rights were affected. *See State v. Rogers*, 2015-Ohio-2459, ¶ 22, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). ("However, even if the error is obvious, it must have affected substantial rights, and '[w]e have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial.' . . . The accused is therefore required to demonstrate a reasonable *probability* that the error resulted in prejudice . . . ." (Brackets and emphasis in original.)). Although there was

26.

not evidence of Koonce's flight sufficient to support a consciousness-of-guilt jury instruction, there was other evidence of his consciousness of guilt before the jury. Specifically, evidence that Koonce lied to the detectives and disposed of the gun he used to shoot C.A. are things that show his awareness of guilt. *State v. Robinson*, 2008-Ohio-3498, ¶ 202 (6th Dist.) ("The law is clear that lies told by an accused are admissible evidence of consciousness of guilt, and thus of guilt itself."); *State v. Brodbeck*, 2008-Ohio-6961, ¶ 48 (10th Dist.), quoting *State v. Brown*, 1988 WL 86965 (8th Dist. July 28, 1988) ("'[A]ttempts to alter or destroy evidence . . . can serve as admissions by conduct of a consciousness of guilt.'" (Brackets and ellipsis in original.)). Because there was other evidence of Koonce's consciousness of guilt before the jury, there is not a reasonable probability that the outcome of the trial would have been different but for the trial court's error in instructing the jury on consciousness of guilt based on flight. *See Vasquez* at ¶ 83. Thus, we conclude that the trial court did not commit plain error by giving a consciousness-of-guilt instruction.

### 2. Substantive offenses

{¶ 76} Koonce next argues that the jury instructions were plainly erroneous because of the way the trial court worded its concluding paragraph for each substantive offense. Koonce is correct that the instructions told the jury that "[i]f you find the State has proven beyond a reasonable doubt all the essential elements . . . , then your verdict must be guilty" and "[i]f you find the State has failed to prove beyond a reasonable doubt any one of the essential elements . . . , then your verdict must be not guilty[,]" without regard to the affirmative defense. But it is also true that the court explained the

27.

affirmative defense and how it applied to the case immediately after those sentences and ultimately told the jury relative to each count,

> If you find that the State proved beyond a reasonable doubt all the elements . . . and that the State proved beyond a reasonable doubt that the defendant did not act in self-defense of another, you must find the defendant guilty. If you find the State failed to prove beyond a reasonable doubt any element . . . , or if you find that the State failed to prove beyond a reasonable doubt that the defendant did not act in defense of another, you must find the defendant not guilty.

When these instructions are viewed "'in the context of the overall charge[,]'" we do not find them to be confusing or misleading. *State v. Diar*, 2008-Ohio-6266, ¶ 126, quoting *State v. Price*, 60 Ohio St.2d 136 (1979), paragraph four of the syllabus. Thus, we find no plain error.

### 3. Verdict forms

{¶ 77} Finally under this assignment of error, Koonce argues that the trial court's error regarding the substantive offenses was compounded because the court did not include any reference to defense of another in the verdict forms. This argument fails for two reasons. First, the trial court did not commit plain error by instructing the jury as it did regarding the substantive offenses. Second, there is no requirement under Ohio law that verdict forms provide a place for the jury to reject an affirmative defense. *State v. McClain*, 2011-Ohio-1623, ¶ 40 (5th Dist.); *State v. Jones*, 2020-Ohio-3367, ¶ 94 (8th Dist.) (citing cases). Koonce's third assignment of error is not well-taken.

### D. Koonce's counsel was not ineffective.

{¶ 78} In his fourth assignment of error, Koonce argues that his trial counsel was ineffective by failing to object to the issues he complains of with the jury instructions,

and but for counsel's errors, there is a reasonable probability that the result of the trial would have been different. He also contends that counsel was ineffective by failing to request a cautionary instruction under R.C. 2933.81 and but for that failure, there is a reasonable probability that the outcome of the trial would have been different.

{¶ 79} The State responds that Koonce cannot show that the jury instructions or verdict forms confused the jury because the trial court thoroughly instructed the jurors on the affirmative defense, Koonce's attorney argued that the state had failed to disprove the elements of the affirmative defense, and the jurors did not ask any questions about the instructions. It also argues that any request for a cautionary instruction under R.C. 2933.81 would have been denied, and defense counsel subjected the detectives to a thorough cross-examination regarding the failure of the audio recording and the limits of their notetaking and recollection and argued about the reliability of the detectives' testimony.

{¶ 80} To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984); and *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. A reasonable probability is one sufficient to undermine confidence in the outcome. *State v. Sanders*, 94 Ohio St.3d 150, 151 (2002). Failure to present sufficient evidence on either prong is

29.

fatal to an ineffective-assistance claim. *State v. Leasure*, 2023-Ohio-2710, ¶ 40 (6th Dist.), citing *Strickland* at 697.

{¶ 81} To prevail on an ineffective-assistance claim, the defendant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *Strickland* at 686. Properly licensed Ohio lawyers are presumed to be competent, and there are "countless" ways for an attorney to provide effective assistance in a case. *State v. Gondor*, 2006-Ohio-6679, ¶ 62; *Bradley* at 142. Thus, "'[j]udicial scrutiny of counsel's performance must be highly deferential.'" *Bradley* at 142, quoting *Strickland* at 689. "[E]ffective assistance of counsel does not equate with a winning defense strategy . . . ." *State v. Strickland*, 2003-Ohio-491, ¶ 16 (6th Dist.).

{¶ 82} Counsel is "strongly presumed" to have rendered adequate assistance and "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *State v. Smith*, 17 Ohio St.3d 98, 100 (1985), quoting *Strickland* at 694-695. Generally, trial strategy and tactical decisions—even debatable ones—cannot form the basis of a claim of ineffective assistance of counsel. *State v. Grissom*, 2009-Ohio-2603, ¶ 22 (6th Dist.).

{¶ 83} Here, even if we assume that counsel was deficient, Koonce cannot show that he was prejudiced by any of counsel's inactions. As we have already discussed, any error related to the consciousness-of-guilt instruction was not prejudicial, the substantive jury instructions were not misleading, and nothing requires verdict forms to address an affirmative defense. Counsel objecting to these things would not have affected the

30.

outcome of the trial. As far as counsel failing to request a cautionary instruction under R.C. 2933.81, defense counsel vigorously cross examined the detectives regarding the failure of the audio recording and the limitations of their recollections due to their limited notetaking. There is no basis to conclude that a cautionary instruction would have led the jury to an entirely different conclusion regarding Koonce's guilt—especially in light of the surveillance video evidence of the fight itself.

{¶ 84} Because Koonce cannot meet the standard for ineffective assistance of counsel, his fourth assignment of error is not well-taken.

### E. Koonce's convictions are not against the manifest weight of the evidence.

{¶ 85} In his final assignment of error, Koonce argues that his convictions are against the manifest weight of the evidence because the evidence shows that he acted in defense of Victinia. He contends that C.A. started a fight with Victinia, he had no way of knowing whether C.A. had a weapon, it was clear that C.A. had the upper hand in the fight because he was on top of Victinia, it was subjectively and objectively reasonable for him to believe that C.A. was going to cause serious bodily harm or death to Victinia, he came to Victinia's defense with a single shot, and once she was safe, did not use any further force. He also points out that the detectives' testimony about what he said during his interview does nothing to counter this evidence.

{¶ 86} The State responds that it disproved each of the elements of defense of another. First, it showed that Victinia was at fault in creating the situation because she threw the first punch and continued to hit C.A. as they fought. Next, it showed that Koonce did not have a genuine, reasonable belief that C.A. posed an imminent danger of

31.

bodily harm to Victinia because Victinia was uninjured and testified that C.A. was not really trying to hit her, Victinia repeatedly hit C.A. and Koonce moved Victinia out of the way before shooting C.A., and Koonce told the detectives that C.A. needed to be taught a lesson. Finally, it showed that Koonce's use of deadly force was disproportionate because Victinia was vigorously attacking C.A. on her own and there was no evidence that C.A.'s inebriation or drug use was apparent or what effect it might have had on the fight.

{¶ 87} Under R.C. 2901.05(B)(1), "[a] person is allowed to act in . . . defense of another . . . ." Defense of another requires proof of the same elements as self-defense. *State v. Cumberlander*, 2024-Ohio-2431, ¶ 41, fn. 9 (10th Dist.), citing *State v. Moss*, 2006-Ohio-1647, ¶ 14 (10th Dist.).

{¶ 88} "A person may use deadly force in self-defense where he (1) was not at fault in creating the situation giving rise to the affray; (2) had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) did not violate any duty to retreat or avoid the danger." *State v. Lathan*, 2024-Ohio-2514, ¶ 77 (6th Dist.), citing *State v. Messenger*, 2022-Ohio-4562, ¶ 14. A person who uses force in defense of others stands in the shoes of the person he or she is defending. *State v. Abalos*, 2011-Ohio-3489, ¶ 14 (6th Dist.), citing *State v. Wenger*, 58 Ohio St.2d 336, 340 (1979). This means that the intervenor "acts at his own peril if the person assisted was in the wrong." *Wenger* at 339. In other words, if the person being defended is at fault in creating the situation giving rise

32.

to the affray, the intervenor is not entitled to claim defense of another. *State v. Shoecraft*, 2018-Ohio-3920, ¶ 34 (2d Dist.).

{¶ 89} Once the defendant presents a viable defense of another claim, the State must disprove one of the elements beyond a reasonable doubt to defeat the claim. *See State v. Weemes*, 2025-Ohio-2319, ¶ 32 (6th Dist.).

{¶ 90} When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trial court clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). We do not view the evidence in a light most favorable to the prosecution. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson*, 2012-Ohio-6068, ¶ 15 (6th Dist.), quoting *id.* at 387. Reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "When reviewing a manifest weight claim involving self-defense, the court reviews the entire record, considers the credibility of witnesses, and determines whether the trier of fact clearly lost its way and created a manifest miscarriage of justice with respect to its finding that the State disproved at least one of the self-defense elements beyond a reasonable doubt." *Weemes* at ¶ 33.

33.

{¶ 91} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the trial court's credibility determinations, given that it is the court that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.).

{¶ 92} The bona fide belief element is a combined subjective and objective test. *State v. Woods*, 2023-Ohio-3549, ¶ 54 (6th Dist.), citing *State v. Lane,* 2023-Ohio-1305, ¶ 24 (6th Dist.); and *State v. Thomas,* 77 Ohio St.3d 323, 330 (1997). "A bona fide belief requires weighing the use of force against the believed danger, permitting 'only such force as is necessary to repel an attack.'" *Id.*, quoting *Lane* at ¶ 24; *State v. Barker,* 2022-Ohio-3756, ¶ 28 (2d Dist.). Furthermore, where the use of force "'was so disproportionate that it shows a purpose to injure, self-defense is unavailable.'" *Id.* at ¶ 56, quoting *Barker* at ¶ 28. Under this element, the factfinder must consider the genuineness and reasonableness of the defendant's belief and whether, under the circumstances, he exercised a careful and proper use of his own faculties. *State v. Links*, 2025-Ohio-264, ¶ 22 (6th Dist.), citing *State v. Stevenson*, 2018-Ohio-5140, ¶ 42 (10th Dist.); and *State v. Sheets*, 115 Ohio St. 308, 310 (1926).

{¶ 93} Here, the jury did not lose its way or create a manifest miscarriage of justice by finding that the State disproved Koonce's defense of another claim because the evidence supports a finding that Koonce did not have a bona fide belief that Victinia was in imminent danger of death or great bodily harm and that her only means of escape from

34.

the danger was the use of deadly force. The evidence shows that there was no indication that C.A. was carrying or attempting to use a weapon during his fight with Victinia, Victinia testified that C.A. was not really trying to hit her, and by the time Koonce decided to intervene, Victinia was on top of C.A. In addition, the jury heard the detectives' testimony that C.A. was a "civilian" in a motorcycle club who needed to be "taught a lesson" about how to behave, which is significant evidence of his state of mind at the time of the shooting. From this evidence, the jury could reasonably conclude that Koonce did not have a bona fide belief that Victinia was in imminent danger of death or great bodily harm and that her only means of escape was the use of deadly force.

{¶ 94} "[I]t is well settled that a conviction is not against the manifest weight of the evidence simply because the [trier of fact] rejected the defendant's version of the facts and believed the testimony presented by the state." (Second brackets in original and internal quotations omitted.) *State v. Tuggle*, 2023-Ohio-3965, ¶ 64 (6th Dist.), citing *State v. Hughkeith*, 2023-Ohio-1217, ¶ 58 (8th Dist.). Moreover, "[w]hen there is more than one believable interpretation of the evidence, we do not choose which theory we believe is more credible and substitute it for the theory chosen by the [fact-finder]." (Brackets in original and internal quotations omitted.) *Id.*, citing *State v. Rydarowicz*, 2023-Ohio-916, ¶ 81 (7th Dist.). Because that is the case, we accept the jury's conclusion that it was not objectively reasonable for Koonce to believe that Victinia was in imminent danger of death or great bodily harm, so the state disproved the bona-fide-belief element of defense of another beyond a reasonable doubt. Additionally, because the State need only disprove one element of defense of another, we need not address the

35.

remaining elements. *See State v. Fisher*, 2024-Ohio-5520, ¶ 38 (6th Dist.). Koonce's fifth assignment of error is not well-taken.

### III. Conclusion

{¶ 95} For the foregoing reasons, the April 3, 2025 judgment of the Lucas County Court of Common Pleas is affirmed. Koonce is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, P.J.
_____
JUDGE

Christine E. Mayle, J.
CONCUR.
_____
JUDGE

Charles E. Sulek, J.
CONCURS AND WRITES
SEPARATELY.
_____
JUDGE

**SULEK, J., Concurring.**

{¶ 96} While I agree with the majority that the trial court did not commit plain error by failing to give a cautionary instruction under R.C. 2933.81, I disagree with its conclusion that the failure to record Koonce's interrogation "stemmed from the imperfect functionality of the equipment itself, and not merely human mistake."

36.

{¶ 97} R.C. 2933.81(B) states that "a custodial interrogation in a place of detention shall be electronically recorded." If law enforcement fails to electronically record a custodial interrogation, the trial court is required to provide a cautionary instruction to the jury regarding the failure to record unless one or more of the circumstances in R.C. 2933.81(C) applies. R.C. 2933.81(D). The State maintains, and the majority holds, that under R.C. 2933.81(C)(2), the trial court was not obligated to provide a cautionary instruction to the jury because the State's recording equipment malfunctioned. I disagree.

{¶ 98} "Malfunction" means "to function imperfectly or badly: fail to operate normally." *Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/malfunction (accessed Mar. 26, 2026); *Black's Law Dictionary* (12th Edition 2024) (defining "malfunction" as "[a] fault in the way something works, as with a machine, a piece of one's wardrobe, or a part of one's body").

{¶ 99} For the recording equipment to have malfunctioned it would need to be shown that the equipment failed to operate in its normal use, or that there was a fault in the way it was supposed to work. For example, a recording equipment malfunction would occur when the record button fails to work when pushed, or when the equipment fails to turn on when the power button is pushed. Nothing like this happened here. Instead, the evidence demonstrates the recording equipment functioned as designed. That is, when someone accidentally touched a button that was designed to disable the audio recording, it worked and recording stopped.

37.

{¶ 100} The majority, nonetheless, reasons that the recording equipment malfunctioned based on testimony about the "imperfect 'configuration' of the touchscreen buttons" that "caused someone to accidentally stop the recording." It further notes that "there was no alert that recording had stopped." While the design configuration of the buttons may be "imperfect," there is no evidence that the buttons did not function as intended. Nor is there any evidence that the recording equipment was designed to provide an alert that recording had stopped but failed to do so.

{¶ 101} The failure to record the interrogation, therefore, was not the result of a recording equipment malfunction, and a precautionary instruction should have been provided to the jury pursuant to R.C. 2933.81(D)(2).

{¶ 102} Despite this error, Koonce, cannot demonstrate plain error because there is not "a reasonable probability that the error resulted in prejudice, meaning that the error affected the outcome." *State v. Echols*, 2024-Ohio-5088, ¶ 50, citing *State v. Knuff*, 2024-Ohio-902, ¶ 117. As the majority correctly notes, video of the incident was admitted into evidence and "defense counsel vigorously cross examined the detectives regarding the failure of the audio recording and the limitations of their recollections due to their limited notetaking." Thus, Koonce has not demonstrated plain error.

{¶ 103} I join the remainder of the majority opinion in its entirety.

his decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.